**Herman HARMON, et al., Appellants,**

v.

**Calvin D. AUGER, Warden, et al., Appellees.**

**No. 84–1784–NI.**

United States Court of Appeals, Eighth Circuit.

Submitted June 10, 1985.

Decided July 18, 1985.

Philip Mears, Iowa City, Iowa, for appellants.

John M. Parmeter, Asst. Atty. Gen., Des Moines, Iowa, for appellees.

Before LAY, Chief Judge, PHILLIPS *, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

PHILLIPS, Senior Circuit Judge.

This action under 42 U.S.C. § 1983 was filed by two inmates of the Iowa Men's Reformatory at Anamosa, and two of their visitors, challenging two Reformatory poli-

cies. The first policy under attack is the suspension of contact visitation privileges of prisoners who, in disciplinary proceedings are found guilty of the possession of drugs. The Reformatory established a no-contact visitation area with a screen between the inmate and his visitor. The second policy relates to the use of the results of a urine drug detection system in finding inmates guilty of a disciplinary violation for possession of drugs.

The case is before this court upon appeal from the final judgment entered by U.S. Magistrate James Hodges, Jr., sitting under authority of 28 U.S.C. § 636(c)(3). The jurisdiction of the Magistrate was based on 28 U.S.C. §§ 1331 and 1343. This court has jurisdiction of the appeal pursuant to 28 U.S.C. § 1291.

The Magistrate held that the imposition of no-contact visitation upon the plaintiff inmates who have been found guilty of possessing a controlled substance does not violate due process; and that the plaintiff inmates do not have a constitutionally protected liberty interest which is inherent in the Constitution of the United States or pursuant to Iowa statutes or administrative regulations.[1]

I

■ The decision of this court in *Hunter v. Auger,* 672 F.2d 668 (8th Cir.1982) barred indiscriminate strip searches of visitors of Reformatory inmates. A practice then was adopted that when an inmate is found guilty of violating disciplinary rule 20 (possession of drugs), he is placed on a no-contact status with respect to all his visitors, with the right to automatic review of that status in ninety days. The Adjustment Committee has no discretion to determine whether the no-contact restriction is

---

* The HONORABLE HARRY PHILLIPS, Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

1. The Magistrate disapproved the practices of the Reformatory of holding that positive results of the urinalysis created an irrebutable presumption before the disciplinary committee of possession of marijuana; and the practice of providing notices without indicating a general date of the alleged marijuana use. These holdings are not challenged on the present appeal. The Magistrate further held that the plaintiff inmates could be reprosecuted for drug violations under approved procedures.

to be applied. It must be enforced in all cases of possession of drugs. If no drug problems occur within a ninety-day period, contact visits generally are restored.

The comprehensive findings of fact of the Magistrate included the following:

> The purpose of this policy is to control the introduction of contraband drugs into IMR. The no-contact status, when imposed, applies to all of a violator's visitors, regardless of their role, or lack thereof, in the rule 20 possession violation. The underlying rationale is that the rule 20 violators have the propensity or disposition to pressure their visitors to smuggle contraband into them, regardless of whether the visitors have done so in the past ...
>
> The introduction of contraband drugs into IMR is a problem pertaining to the order and security of the institution. Visitors are the largest source of introducing contraband drugs into the reformatory. In 1982 IMR had an average of 1,025 residents, and approximately 2,300 residents passed through in all. Each resident had approximately 5–6 visitors. It would be impracticable for IMR authorities to check each visitor's background for drug abuse, because the reformatory lacks adequate manpower to do so. Also, a background check may be ineffectual to some extent where visitors abuse drugs but have no record of drug abuse. The implementation of the policy (hereinafter "no-contact policy") has led to a reduction in drug abuse at IMR.

In addressing a due process challenge, a court must determine whether a prisoner has a liberty interest protected by the fourteenth amendment. *Vruno v. Schwarzwalder,* 600 F.2d 124, 128–29 (8th Cir.1979). A liberty interest may be inherent in the Constitution or created by State law. Prison inmates retain only those rights consistent with legitimate penal objectives. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977).

■ In *Block v. Rutherford,* —— U.S. ——, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984), the Supreme Court ruled that an inmate has no constitutional right to contact visitation. The Court held that if a restriction is not punitive but merely incidental to, and reasonably related to, a legitimate government objective, and not excessive to its purpose, there is no constitutional violation. Appellees emphasize that the restrictions relate to the legitimate interest in preventing unauthorized use of drugs in prisons. Visitors of inmates are viewed as the chief source of contraband and the prison officials believe inmates found to use marijuana are more likely to persuade their visitors to bring it to them. We agree with the Magistrate that the procedures do not run afoul of any liberty interests under the guidelines of *Block.*

## II

■ In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court held that State laws or regulations expressed in mandatory language may create a liberty interest subject to due process protections. *See also Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). Plaintiffs argue that State rules establish a liberty interest in contact visitation arising from limits placed on the warden's discretion to deny such visits.

In regard to visitation, the Iowa Code provides that certain public officials and religious officials shall be granted admission to State institutions; however, "No other person shall be granted admission except by permission of the warden." Iowa Code § 246.46. Further, the Iowa Administrative Code provides:

> Individuals may have visiting privileges modified or terminated when: (a) the inmate or visitor engage in behavior that may in any way be disruptive to the order and control of the institution; (b) the visitor or inmate fails to follow the established rules and procedure of the institution; (c) the visitor and the inmate directly exchange any object or article. This does not apply to purchases from

the canteen which are consumed during the visit; (d) the effect of alcohol or narcotic drugs is detected before, during or after the visit; (e) the visit or continued visiting is detrimental to the health of the inmate or visitor; (f) the visitor does not manage children to prevent them from interfering with or disrupting other visits.

I.A.C. § 770–16.3(5). Additionally, Iowa Administrative Code § 16.3(6) provides:

Visits with no physical contact may be granted when visits are beneficial for the inmate, visitor and the institution and the order or security of the institution may be threatened.

I.A.C. § 770–16.3(6).

Appellants argue these rules require some nexus between the visit and misconduct on the part of the visitor or inmate. Appellees stress that sections 246.46 and 16.3 make no reference to contact visits. Noting that § 246.46 makes visits discretionary with the warden, appellees argue that § 16.3(6), while referring to contact visits, does not contain any mandatory language that indicates prisoners are entitled to contact visitation. They cite *Jones v. Mabry*, 723 F.2d 590 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984) in support of their position that these provisions create no substantive limitation on the discretion of prison officials in granting no-contact visitation.

Appellants also cite language from general orders issued within the Reformatory. General Order Number 6, first issued February 19, 1979, provides:

The use of the no contact visiting facilities is for the purpose of maintaining security of the institution primarily through the control of contraband. It will not be seen or used as a means of punishment per se.

The use of the no contact facilities will be limited to the following instances:

(1) Reinstated visitors who refuse personal searches. (See General Order—Institutional # 32)

(2) Residents who have been found in possession of drugs in the institution will have their visits screened and no contact visits will be arranged for visitors who are suspects.

(3) Visitors who are designated to be personally searched and staff is not on duty to perform the search. (This will avoid calling staff into the institution when off duty.)

(4) Any resident who is designated by the Adjustment committee who represents a behavioral/control and/or security problem.

Appellants also cite language from the employee manual, in effect before March 1982, providing that visiting privileges may be modified for disruptive conduct or intoxication before or during a visit. They maintain that prior to March 1982 administrative rules required a connection between misconduct and the visit itself or a particular suspicion regarding a prisoner in order to modify visitation privileges.

On March 4, 1983, a new General Order 6 was issued to reflect a new policy on no-contact visits. It provided that any time an inmate is found in possession of contraband, "his visits will be reviewed and no-contact visits will be instituted in those instances where control is deemed appropriate." The order also provided for no-contact visits when the inmate presents a security problem or is in disciplinary detention. Shortly afterward, the employee manual was amended to mirror the language of I.A.C. § 770–16.3(5). Appellants argue that while the formal administrative rule has not been changed since it was adopted in 1981, the interpretations of this rule have changed dramatically. The new interpretation, first reflected in institutional practice and later in General Order # 6, authorizes no-contact visits even in the absence of visitor misconduct.

Appellants were placed on no-contact status in December 1982. The practice of instituting the restrictions for drug use not connected with visitation formally was reduced to writing in 1983 under General Order # 6. Appellant Harmon was found

in possession of a marijuana cigarette in June 1982 and was placed on no-contact status through December, when his urinalysis revealed THC. His no-contact status then was continued indefinitely. Appellant Burton also was placed on no-contact status in December based on his own urinalysis. Appellants emphasize there was no evidence linking their drug use to visitors. They argue that administrative rules existing at the time established an expectancy of contact visits in the absence of misconduct relating directly to the visits. They argue that the specific reasons for modifying visitation set forth in administrative rules and institutional policy established a liberty interest in visitation absent certain behavior.

Appellants contend that the current policy violates due process because visitation can be limited without suspicion or belief that a particular visitor is responsible for bringing contraband into the prison. They also argue the lack of notice or reasons for the decisions. They conclude that the no-contact visitation sanctions were arbitrary and capricious and violated the prison's own rules. Appellants argue the current rules require a particular suspicion about a visitor prior to instituting no-contact visits.

We conclude that plaintiffs did not have a liberty interest under State law. Existing State law and regulations did not prevent defendants from ordering no-contact visitation for drug use not directly connected to an inmate's visitation. I.A.C. § 770–16.3(6) provided that no-contact visits could be ordered whenever "beneficial for the inmate, visitor and the institution and the order or security of the institution may be threatened." Under the proper procedures mandated by the Magistrate, proven drug use by an inmate amounts to a threat to security that justifies the limited period of no-contact visitation imposed by Reformatory officials. The marijuana use need not be connected directly to the inmate's visitors in order for the committee to impose the sanction.

## III

Appellants argue that the rules on no-contact visitation violated the Iowa Administrative Procedure Act. Iowa Code § 17A.3(2) requires State agency rules to be made available for public inspection prior to adoption, to allow for public comment. Section 17A.4(3) of the Act provides that no rule adopted without this procedure is valid. Section 17A.2(7) defines "rules" subject to the Act. Section 17A.2(7)(k) provides that "rule" does not include a "statement concerning only inmates of a penal institution."

A federal court has authority to consider State law and administrative regulations to determine whether they provide a liberty or property interest affording due process protection. A federal court does not have jurisdiction, however, to award relief against a State based only on State law where violation of State law does not amount to a constitutional violation. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Iowa Administrative Procedure Act is a comprehensive procedural plan established by State law. Violation of the Act is a violation of State law and not of due process. Jurisdiction to construe the State statute is in the State Courts of Iowa.

Accordingly, we vacate the Magistrate's holding, issued prior to *Pennhurst,* that there was no violation of the Iowa Administrative Procedure Act. This is a question for determination by the State Courts of Iowa.

## IV

Appellants argue that their due process rights were violated because the disciplinary committees failed to give a statement of the reasons for imposing the no-contact sanction. In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) the Supreme Court held that prison disciplinary committees should provide a written statement of the evidence relied upon in making the decision and the reasons for the disciplinary action. Appellants

note that the committees made no statements explaining why they imposed a no-contact sanction. They stress that Harmon was not provided a written statement of the reasons for imposing indefinite no-contact status on him, arguing the committee was not even aware his previous visits had been no-contact as well.

We conclude that the decision of the Reformatory disciplinary committee stated sufficiently the reasons for placement on a no-contact status. The disciplinary decision sets forth clearly the facts upon which the violation of rule 20 were based. The inmates received an adequate statement of the reasons for sanctions, in compliance with *Wolff v. McDonnell.*

■ Appellants also challenge the notice they received ordering them to respond to charges of violating prison rules. Noting that inmates must receive notice of the charges to which they are to respond, *Wolff,* 418 U.S. at 564, 94 S.Ct. at 2978, they argue that the reports they received were inadequate. Both inmates were charged with "possession of contraband." They received reports stating that the urine samples obtained on particular dates in December 1982 were positive for THC. The Magistrate ruled that notices should state there was consumption of marijuana within 30 days of the test. Although the Magistrate held in favor of appellants on this issue, they appeal because they contend the notice requirements issued by the Magistrate do not go far enough.

The Magistrate held as follows:

... where the exclusive evidence that prison authorities have that a prisoner is guilty of possessing drugs in violation of disciplinary rules is based on data from an EMIT–ST test, the notice of the charge need not contain the specific date and location on which the violation occurred.

... At least the general time of a drug possession offense must be specified when the only evidence of the offense consists of the results from an EMIT–ST test. The scientific testimony indicates that ingestion of THC must occur within

thirty days prior to a positive result for THC from an EMIT–ST test. Thus, the disciplinary notice could have and should have stated a thirty day range in which the possession offense took place.

Appellants note that the EMIT machine cannot locate with precision the date on which the subject smoked marijuana. They argue that the remedy proposed by the Magistrate is inadequate because it is almost impossible to present a defense when the date is not identified more precisely. They rely on *Rinehart v. Brewer,* 483 F.Supp. 165 (S.D.Iowa 1980) where the court held due process was not satisfied when a prisoner was charged with extorting sexual favors some time in the recent past.

We conclude that appellant inmates have adequate notice of charges and can prepare defenses under the accommodation proposed by the Magistrate. Inmates can challenge the accuracy of test results and raise the defense of passive inhalation. The machine is about 95 percent accurate and will detect traces of THC up to 30 days after the subject ingests marijuana. Test results form a sufficient basis for disciplinary action and foster the objective of preventing drug usage at the Reformatory. Appellees assert that the requirement that authorities identify a specific date of possession would eliminate the usefulness of the urine analysis testing program as a tool to further the State's interest.

After the Magistrate ruled that the 1982 possession reports and hearings were unconstitutional and expunged appellants' records, he held that retrial was not precluded so long as the defects were corrected. Appellants argue this ruling was erroneous because they would be unable to "reconstruct their activities" during the 30 day period before testing. They note that the test sample for Harmon now has too high a "ph" level to allow retesting. They also argue that a new proceeding would present the danger that the committee would retaliate or revert to the old conclusive presumption analysis. They note that another institution, the Iowa State Peniten-

tiary, has adopted an automatic nonprosecution policy in cases of due process violations. *Rinehart,* 483 F.Supp. at 171.

We conclude that the Magistrate's order of expungement adequately assures that if the Magistrate's procedures are followed, plaintiff inmates will not be subject to due process violations. Any reprosecution must comply with the requirements established by the Magistrate—adequate notice of the general time of the suspected violations and opportunity to rebut proof of the urinalysis. The disciplinary committee must consider defenses to the charges, including challenges to the reliability of EMIT–ST test results and must provide notice of the time frame within which marijuana use can be detected. Under these limitations, retrial after expungement does not violate due process. Sanctions for any violations found after reprosecution must not be imposed vindictively. Any disciplinary measures imposed must take into account the time the inmates already served on no-contact status as a result of the earlier proceedings.

V

■ Finally, appellants challenge the Magistrate's holding that defendants were entitled to qualified (good faith) immunity from liability for damages for the due process violations. These violations were the issuance of disciplinary reports without sufficient notice of a general date and the application of an irrebutable presumption at disciplinary proceedings.

A public official is entitled to qualified or good faith immunity unless the official knew or reasonably should have known that his action would violate the constitutional rights of the plaintiff or if he took the action with the malicious intention to cause a deprivation of constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). *See also Wycoff v. Brewer,* 572 F.2d 1260, 1267 (8th Cir.1978); *Ervin v. Ciccone,* 557 F.2d 1260, 1262 (8th Cir.1977). In determining the reasonableness of an official's belief that an action was constitutional, the court should look to whether the action violated a well-settled and unquestioned constitutional right.

■ Although it was established that inmates are entitled to notification of the date of the violation, it was a case of first impression to consider the date based on results of urinalysis. Appellees concede that irrebutable presumptions are disfavored under due process. They assert, however, that the urinalysis machine was sufficiently reliable (95% reliable) to justify its use. After making thorough findings of fact and conclusions of law, the Magistrate found that defendants acted in good faith and are entitled to qualified immunity. We agree.

We hold that the foregoing findings of fact of the Magistrate are not "clearly erroneous" and that his conclusions of law are correct. However, as hereinabove stated, we vacate the Magistrate's holding, issued prior to the decision of the Supreme Court in *Pennhurst,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67, that there was no violation of the Iowa Administrative Procedure Act.

Otherwise, the judgment is affirmed.