[No. 53580-9.  En Banc.  November 25, 1987.]

*In the Matter of the Personal Restraint of*
JEFFREY H. C. JOHNSTON, ET AL,
*Petitioners.*

*Fred S. Finkelstein* and *Hillis, Cairncross, Clark & Martin, P.S.,* by *George A. Kresovich* and *Laurie Lootens Chyz* (of the American Civil Liberties Union), for petitioners.

*Kenneth O. Eikenberry, Attorney General,* and *Glenn L. Harvey, Assistant,* for respondent.

CALLOW, J.—This case involves 10 consolidated personal restraint petitions. Five of the petitioners (Johnston, Jordan, Coleman, Miller, and Hunter) are represented by counsel; the other five (Black, Whitfield, Rose, Stokes, and Jones) are pro se.

All of the petitions present the following issue: Does a positive result to an "EMIT" urinalysis test, conducted to detect the presence of marijuana, constitute sufficient evidence of marijuana use to uphold a prison disciplinary decision revoking a prisoner's good time credits or imposing mandatory segregation time? We hold in the affirmative, and dismiss all 10 personal restraint petitions.

The petitioners are inmates of correctional facilities operated by the Washington State Department of Corrections. Each inmate was found, by a prison disciplinary hearing, to have violated WAC 137–28–030(603) (Rule 603), which *inter alia* prohibits prisoners from using marijuana. The Department in each case relied upon the results of a urinalysis test marketed by the Syva Company and known as the enzyme multiplied immuno–assay technique (EMIT). Each inmate tested positive for marijuana use.

In the case of Johnston, Jordan, Coleman, Stokes and Miller,[1] a single positive EMIT test was the sole basis for the Department's determination that the inmate had used marijuana. In the other cases, the Department relied upon a positive EMIT test result plus other corroborating evidence, as follows: (1) Black—A guard reported that Black was "observed on the Resident Services Floor believe[d] to be smoking pot" and that his cell "smell[ed] of marijuana." (2) Hunter—A guard smelled marijuana in the vicinity of a group of cells housing Hunter and three other inmates. Hunter was given two EMIT urinalysis tests, both of which were positive for marijuana. (3) Jones—A search of the warehouse in which Jones was working uncovered a mari-

---

[1]Petitioner Miller originally challenged a second infraction for marijuana use which was based on both a positive EMIT test result and other corroborating evidence. Miller no longer challenges this second infraction.

juana pipe, following which Jones was given two EMIT urinalysis tests. Both tests were positive for marijuana. (4) Whitfield—At his prison disciplinary hearing, he admitted, "I smoked a joint, because I was depressed from the news I got from the Parole Board." (5) Rose—At his prison disciplinary hearing, he stated that his urine sample should not have come up positive for marijuana and he admitted, "I flushed my system before the test". As to petitioner *Stokes,* the Department claims that "marijuana paraphernalia" was found in his cell which corroborates the positive urinalysis test result. However, while a can containing "suspected hashish" was located, the disciplinary hearing reports indicate that Stokes was found guilty of violating Rule 603 solely on the basis of the single EMIT urinalysis test.

The Department found all 10 inmates guilty of using marijuana in violation of Rule 603. It imposed sanctions consisting of the loss of 15 or 30 days of "good time" credits, and, in some cases, imposed mandatory segregation time. The recommended sanctions for 3 of the inmates were suspended and not imposed. The inmates all filed personal restraint petitions in the Court of Appeals where they were consolidated and certified to this court.

## I

It is undisputed that the Department of Corrections has the authority to sanction prison inmates who use or possess illegal drugs in violation of prison regulations. Rule 603 provides:

> Serious infractions. Any of the following types of behavior shall constitute a serious infraction:
>
> . . .
>
> 603—Possession, introduction, transfer, or use of any narcotics, controlled substance, or related paraphernalia; possession, transfer, or use of any intoxicant or drug not prescribed or authorized for the inmate or for the inmate to whom transferred, if applicable, by the medical staff; or being intoxicated, or under the influence of an unauthorized drug, narcotic, controlled substance, or other intoxicant[.]

WAC 137–28–100 states:

(1) If the hearing officer determines that an inmate is guilty of a serious infraction . . . he/she may impose one or more of the sanctions provided in WAC 137–28–105.

. . .

(3) The hearing officer may suspend the execution of a proposed disciplinary sanction for a fixed period of time, not to exceed six months, subject to the good behavior of the inmate and/or meeting other conditions as specified by the hearing officer. If the subsequent behavior of the inmate is appropriate, the hearing officer shall, at or prior to the end of the fixed period, cancel execution of the penalty.

The sanctions which may be imposed for serious infractions are listed in WAC 137–28–105(2). These sanctions include:

(h) Transfer to the maximum security or segregation section, for a period not to exceed thirty consecutive days;

. . .

(k) Recommendation to the superintendent that he/she not certify good conduct time credit for an inmate to the board of prison terms and paroles, pursuant to RCW 9.95.070 or that he/she deny good conduct time credit for those inmates not under jurisdiction of the board.

The sanctions imposed on the 10 petitioners, which included revocation of good time credits and in some cases, mandatory segregation time, were thus valid if there is sufficient evidence to support the prison disciplinary board's findings that the petitioners used marijuana in violation of Rule 603.

## II

The petitioners contend that a single positive result to an EMIT urinalysis test does not constitute sufficient evidence of marijuana use to uphold a prison disciplinary decision revoking a prisoner's good time credits or imposing mandatory segregation time. The petitioners therefore contend that to use a single positive EMIT test result as a basis for imposing these sanctions violates due process. We disagree.

■ Where, as here, a statute permits an inmate to earn

good time credits,[2] the inmate has a constitutionally protected liberty interest in those credits which prevents their deprivation absent observation of minimum due process requirements. *Superintendent, Mass. Correctional Inst. v. Hill,* 472 U.S. 445, 453, 86 L. Ed. 2d 356, 105 S. Ct. 2768 (1985); *Wolff v. McDonnell,* 418 U.S. 539, 557, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974). However, the nature and scope of the due process rights afforded to inmates is necessarily limited. *Wolff,* at 555–56. The inmate's interest "must be accommodated in the distinctive setting of a prison, where disciplinary proceedings 'take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so.'" *Hill,* at 454, quoting *Wolff,* at 561. The safeguards required to ensure due process must be evaluated in light of the legitimate institutional need to assure the safety of inmates, avoid burdensome administrative requirements that might be susceptible to manipulation, and preserve the disciplinary process as a means of rehabilitation. *Hill,* at 454–55.

The evidentiary requirements of due process are satisfied if there is "some evidence" in the record to support a prison disciplinary decision revoking good time credits. As emphasized in *Hill,* at 455–56:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any evidence* in the record that could support the conclusion reached by the disciplinary board. We decline to adopt a more stringent evidentiary standard as a constitutional requirement.

(Citations omitted. Italics ours.) The "some evidence" or "any evidence" test likewise applies when evaluating the legality of a prison disciplinary decision which imposes a sanction of isolation or mandatory segregation time. *In re Reismiller,* 101 Wn.2d 291, 295–96, 678 P.2d 323 (1984).

---

[2]*See* RCW 9.95.070.

The petitioners contend that we should apply a stricter evidentiary standard than the "some evidence" standard. Specifically, they urge that EMIT urinalysis test results must pass muster under the so–called "*Frye* test" before they may be considered as a basis for disciplining prison inmates. *See Frye v. United States,* 293 F. 1013, 1014 (D.C. Cir. 1923). Under *Frye,* evidence derived from a scientific theory or principle is admissible only if the principle has achieved general acceptance in the relevant scientific community. *See State v. Allery,* 101 Wn.2d 591, 682 P.2d 312 (1984) (battered woman syndrome evidence admissible); *State v. Martin,* 101 Wn.2d 713, 684 P.2d 651 (1984) (hypnosis evidence inadmissible); *State v. Canaday,* 90 Wn.2d 808, 585 P.2d 1185 (1978) (retesting of used Breathalyzer ampuls inadmissible); *State v. Woo,* 84 Wn.2d 472, 527 P.2d 271 (1974) (polygraph evidence inadmissible in absence of stipulation by both parties).

*Frye* is inapplicable. Its rationale has been applied in the context of criminal trials, but not in the context of prison disciplinary proceedings. "Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances." *Hill,* at 456. Other courts have implicitly rejected the stringent *Frye* standards in holding EMIT urinalysis tests admissible in prison disciplinary proceedings. As stated in *Spence v. Farrier,* 807 F.2d 753, 756 (8th Cir. 1986):

> Although it is conceivable that an inmate could be unjustly disciplined as a result of EMIT tests, the margin of error is insignificant in light of institutional goals. States need not implement all possible procedural safeguards against erroneous deprivation of liberty when utilizing results of scientific testing devices in [prison disciplinary] proceedings.

*Peranzo v. Coughlin,* 608 F. Supp. 1504, 1507–08 (S.D.N.Y. 1985), another case involving EMIT urinalysis tests conducted on prison inmates, similarly notes:

The question, "How reliable is the test?" is one for scientists to resolve; the question, "Is the test sufficiently reliable such that its use as the basis for imposing disciplinary sanctions against prisoners does not offend constitutional standards?" is a legal matter to which different standards apply.

Obviously, the possibility that any person may unjustly suffer any deprivation because of a fallible scientific procedure is a cause for serious concern. We recognize that [the inmates'] interest in the accuracy of the drug testing procedures utilized by the defendants in this case is substantial. The courts have also recognized, however, that due process is not synonymous with a requirement of scientific exactitude or error–free procedures. . . . [I]f due process does not require error–free determinations in matters affecting the liberty interests of ordinary citizens, then mandating such a level of accuracy would certainly overstate the requirements of due process in the context of prisoner drug–testing.

(Citations omitted.) *Accord, Vasquez v. Coughlin,* 118 A.D. 2d 897, 499 N.Y.S.2d 461 (1986).

Applying the evidentiary standard enunciated in *Hill,* we conclude that a single positive result to an EMIT urinalysis test clearly provides some evidence of marijuana use. *Jensen v. Lick,* 589 F. Supp. 35, 38 (D.N.D. 1984) noted that the Center for Disease Control in Atlanta has determined EMIT tests to be 97 to 99 percent accurate. Other courts have made similar findings as to the reliability of EMIT tests. *Harmon v. Auger,* 768 F.2d 270, 276 (8th Cir. 1985) (EMIT test found 95 percent accurate); *Lovvorn v. Chattanooga,* 647 F. Supp. 875, 877 (E.D. Tenn. 1986) (same); *Peranzo,* at 1513 (court noted that EMIT test used in Vermont's inmate drug testing program has a 97 percent to 100 percent reliability rate). *See also Smith v. State,* 250 Ga. 438, 298 S.E.2d 482 (1983) (EMIT test held to be sufficiently reliable evidence of drug use in a probation revocation hearing). In addition, the Department has provided several expert affidavits which describe the EMIT test as "extremely reliable", "highly reliable", or "very reliable". One expert added that a single EMIT test is more than

sufficient when only a "presumptive finding" of marijuana use is sought.

We recognize that expert opinion on this matter is not unanimous. The petitioners have submitted the affidavits of two experts which challenge the reliability of a single EMIT test. They also refer to a New Jersey Department of Corrections study, cited in *Peranzo,* at 1511, which found the single EMIT test to be 75 percent accurate. This discrepancy in findings would be troubling in the context of a criminal trial, in which the State bears the burden of proving beyond a reasonable doubt that the defendant has used illegal drugs. In light of the lesser evidentiary standards applicable in prison disciplinary hearings, we deem these differences immaterial.

We hold that a single positive result to an EMIT urinalysis test provides some evidence of marijuana use and uphold the sanctions imposed on the 10 petitioners. In light of our holding, we need not consider the additional corroborating evidence of marijuana use present in the cases of certain of the petitioners.

### III

The additional claims of error raised by the pro se petitioners we dismiss as without merit. First, they assert that "reasonable advance notice" must be given before a urinalysis test is taken. In essence, they contend that random urinalysis tests of prison inmates are invalid. (Petitioners Whitfield and Rose were selected for testing on a random basis.) We disagree. *Hudson v. Palmer,* 468 U.S. 517, 82 L. Ed. 2d 393, 104 S. Ct. 3194 (1984) noted the ever–present and pressing problem of drugs in prisons. The Court added:

> The uncertainty that attends random searches of cells renders these searches perhaps the most effective weapon of the prison administrator in the constant fight against the proliferation of . . . illicit drugs, and other contraband.

*Hudson,* at 528. Random urinalysis tests of prisoners are likewise valid. *Jensen v. Lick,* 589 F. Supp. 35, 37–38

(D.N.D. 1984). As for pro se petitioners' contention that the random testing procedures employed by the Department have somehow been "abused", no evidence in the record supports this contention.

The pro se petitioners also contend that the tests are not carried out in a manner respecting the "maximum amount of privacy". However, the substance abuse testing procedures used by the Department of Corrections clearly indicate that the tests are done "in private and outside the presence of other inmates or non–involved staff"—except, of course, that security or medical staff must be present to insure that the urine specimen is unadulterated. Petitioners have shown no evidence that these procedures have not been followed.

Finally, some of the pro se petitioners contend that they were not informed of the date on which the alleged use of marijuana occurred, and that they were denied access to an actual copy of the EMIT test results. They have not, however, shown how the unavailability of this information prejudiced them in any way. *See In re Hews,* 99 Wn.2d 80, 88, 660 P.2d 263 (1983) (personal restraint petitioner must show that alleged error resulted in actual prejudice). We note that the petitioners were afforded all of the procedural due process protections applicable in prison disciplinary hearings, namely: (1) advance written notice of the alleged violation; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in their defense; and (3) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action. *Hill,* at 454. The pro se petitioners' claims are without merit.

Each of the 10 personal restraint petitions is dismissed.

BRACHTENBACH, DOLLIVER, ANDERSEN, and DURHAM, JJ., and JAMES, J. Pro Tem., concur.

PEARSON, C.J., concurs in the result.

UTTER, J. (dissenting in part)—I believe that the State Department of Corrections has compelling and legitimate reasons to control the use of illegal drugs in prison. I also agree with the majority that the United States Supreme Court has defined the nature and scope of the due process rights of prison inmates as considerably more limited than those enjoyed by other citizens. *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974). Our own decisions have acknowledged this lesser degree of protections for inmates. *In re Reismiller,* 101 Wn.2d 291, 293, 678 P.2d 323 (1984); *In re Young,* 95 Wn.2d 216, 220, 622 P.2d 373 (1980).

Despite our agreement on these basic points, I cannot concur with the majority's conclusion on the narrow issue presented by this case. I agree that the Department's procedure satisfied due process requirements as to the petitioners before the court against whom the Department had corroborating information of marijuana use beyond the EMIT tests. I disagree, however, with the majority's treatment of the other petitioners' cases.

In *Reismiller,* this court expressly adopted the "any evidence" or "some evidence" test from the federal courts for determining whether a prison disciplinary decision revoking good time credits had satisfied evidentiary requirements. However, a single positive result to an EMIT urinalysis test does not supply "some evidence" of marijuana use, unless the EMIT test has been determined to present probative evidence at all under the *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923) and *State v. Canaday,* 90 Wn.2d 808, 585 P.2d 1185 (1978) tests. If this court fails to submit the EMIT test to examination under the *Frye–Canaday,* standard, it condones the State's use of information estimated by some experts to be only 75 percent accurate, *Peranzo v. Coughlin,* 608 F. Supp. 1504, 1511 (S.D.N.Y. 1985), to deprive prison inmates of a substantial interest. As the United States Supreme Court stated in *Wolff:*

> But though his rights may be diminished by the needs and exigencies of the institutional environment, a pris-

oner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country.

*Wolff v. McDonnell,* 418 U.S. at 555–56.

Although the full panoply of rights due defendants in criminal proceedings do not apply in prison disciplinary proceedings, the due process clause still operates to insure that state–created rights such as prisoners' good time are not arbitrarily abrogated. *Wolff,* 418 U.S. at 557. If this court accepts the State's use of a drug testing procedure that has not been judicially determined to be probative at all, the State is free to resort to entirely arbitrary bases for punishing prisoners, fairly or unfairly. Deprivation of prisoners' interests is left to the unfettered discretion of prison administrators and guards.

A coin toss will be at least 50 percent accurate in determining whether an infraction has occurred. Nonetheless, this would not provide "some evidence" that the infraction had occurred such as would justify deprivation of a liberty interest. Evidence presented by the Department in a disciplinary proceeding to deprive prisoners of good time must pass at least minimum standards of reliability, or the State may deprive inmates of their interests on the basis of wholly unscientific information. Because I believe that the majority opinion does not provide even minimal protection for prisoners against the arbitrary action of the State, I dissent.

DORE, J., concurs with UTTER, J.