[No. 33128-1-I.   Division One.   June 13, 1994.]

WILLIAM FOSTER REESE, ET AL, *Appellants*, v. JAMES E. STROH, JR., ET AL, *Respondents*.

*Dwayne A. Richards* and *Richards & Kinerk Inc., P.S.; Douglass A. North* and *Maltman, Reed, North, Ahrens & Malnati, P.S.,* for appellants.

*Mary H. Spillane* and *Williams, Kastner & Gibbs; Kathryn M. Battuello* and *Moody & Battuello,* for respondents.

*Malcolm L. Edwards* on behalf of State Medical Association, amicus curiae.

*Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association, amicus curiae.

*Linda Clapham* on behalf of Washington Defense Trial Lawyers, amicus curiae.

AGID, J. — William Foster Reese and Frances Reese (the Reeses) brought this medical malpractice action against Dr. James E. Stroh, Jr., alleging that he negligently failed to treat Mr. Reese's emphysema condition with a protein replacement therapy called Prolastin. The Reeses contend that the trial court erred in excluding their expert medical witness testimony on the basis that it lacked sufficient foundation to go to the jury. We reverse.

# I
## FACTS

William Reese (Reese) was born in 1938. In 1984, Reese began seeing Dr. Stephen Aprill for treatment of asthma. One year later, Dr. Aprill referred Reese to Dr. Stroh[1] because he was concerned that "something else" was going on with Reese's condition. Dr. Stroh diagnosed Reese with asthma, chronic obstructive pulmonary disease and alpha-1 antitrypsin (AAT) deficiency. AAT is a blood-borne protein which prevents the enzyme neutrophil elastase from destroying the alveoli in the lungs. National Insts. of Health, *Intravenous Replacement Therapy for Patients With Severe Alpha-1 Antitrypsin Deficiency*, 248 JAMA 1693 (1982). A person with severe AAT has very little antitrypsin in his or her blood, *i.e.*, 25 to 40 milligrams per hundred. When Dr. Stroh tested Reese's serum level in May 1985, it was 35.5. Experts believe that, in patients with AAT deficiency, the unchecked action of neutrophil elastase or "proteases" on lung tissue causes development of emphysema. Mark D. Wewers et al., *Replacement Therapy for Alpha-1 Antitrypsin Deficiency Associated With Emphysema*, 316 New Eng. J. Med. 1055, 1060 (1987).

When Dr. Stroh diagnosed Reese with AAT deficiency in 1985, AAT therapy, marketed under the name Prolastin, was not available. Dr. Stroh prescribed bronchodilator medi-

---

[1]Dr. Stroh is board certified in allergy and immunology. He has practiced medicine since 1961.

cations, steroids, and antibiotics, and urged Reese to stop smoking and avoid allergens and environmental irritants. Dr. Stroh told Reese that he should "not worry" about his emphysema and that it was "not serious". Dr. Stroh estimated that Reese would lose approximately 1 percent of his lung capacity per year more than the average person.

In November 1989, Reese learned that his brother had been diagnosed with AAT deficiency and was going to begin Prolastin therapy. According to the Plaintiffs' expert witness, Dr. Robert Fallat, Prolastin was first released on the market in 1987. It is a preparation of the natural protein AAT drawn from pooled human serum. An injection of Prolastin into the blood of patients with AAT deficiency raises their blood protein levels from 25 to 35 milligrams to 150 milligrams and maintains the serum level above the critical 80 milligram level for about 1 week. This is the level thought to prevent patients from developing lung disease as a result of AAT deficiency. After learning about Prolastin from his brother, Reese went to see his brother's doctor, Dr. Michael D. Eulburg. Dr. Eulburg began Reese on Prolastin therapy in March 1990, as soon as arrangements could be made to pay for the drug.

In October 1990, the Reeses filed this action against Dr. Stroh, alleging that his failure to prescribe Prolastin resulted in a worsening of Reese's lung function. At trial, the defense moved to exclude Dr. Fallat's testimony on the ground that it lacked adequate foundation. The Plaintiffs presented Dr. Fallat's testimony as an offer of proof. Dr. Fallat is a pulmonary physician and chief of the pulmonary division at California Pacific Medical Center in San Francisco. He is board qualified in internal and pulmonary medicine. He has been doing research on AAT deficiency since 1966. Dr. Fallat testified that in 1987, the Food and Drug Administration (FDA) met with a large working group of physicians from the National Institutes of Health (NIH) to discuss the possibility of treating AAT deficiency with Prolastin. Based on studies concluding that the administration of Prolastin would correct AAT deficiency in the bloodstream, and "that there was a very

strong association between [AAT] deficiency of this protein and the rapid development of emphysema in some people with this deficiency", the FDA approved the drug without statistical proof that the drug was effective in halting the progression of lung disease.[2] The FDA determined that proving the efficacy of Prolastin in treating emphysema would require a population study involving 600 people. The study would take 3 to 5 years to complete and would be very expensive. Because the study was "impossible" to do and "wouldn't be done", the FDA decided to release the drug for AAT deficient patients "because it was very probable that the material was safe and effective". Dr. Fallat added that "it was very important to get this treatment out because there were people suffering". Dr. Fallat also testified that, as of May 1992, over 2,000 were being treated with Prolastin and there had been no documented cases of hepatitis or AIDS contamination. He also stated that "preliminary results would suggest that [the drug] is stabilizing the patients".

Dr. Fallat acknowledged that only population studies could prove with statistical significance that a particular drug is effective in treating patients with a particular disease, and that no such study had been done on Prolastin. However, he distinguished between drawing the conclusion that a drug has been proved effective for a certain population and the conclusion that a drug has a good probability of improving a specific patient's condition. Dr. Fallat testified that Reese is a severely AAT-deficient patient, labeled a "ZZ" phenotype. For patients with severe AAT deficiency like Reese, there was a strong consensus among the NIH working group members that AAT would be of particular benefit, i.e., for those severely deficient patients who had already developed "significant disease".

---

[2] In the Wewers study, the authors state that they did not *design* the study to demonstrate that AAT therapy would delay or halt the progressive deterioration of lung function. However, the study concludes that "infusions of alpha-1-antitrypsin provide a feasible approach to treating patients with pulmonary emphysema due to [AAT deficiency]." Wewers, at 1060. This conclusion is supported by the theory that "the development of emphysema [in AAT-deficient patients] is believed to be caused by the unchecked action of proteases on lung tissue." Wewers, at 1055.

In addition to the FDA approval of Prolastin and the preliminary salutary results from its use, Dr. Fallat testified to his own clinical experience in treating AAT-deficient patients with Prolastin. He stated that of the 35 to 40 such patients on his registry, half are being treated with the drug. Dr. Fallat testified that, for those patients

> [Prolastin therapy] certainly has been safe and seemingly effective. It seems to be particularly useful in patients who have an inflammatory or asthmatic component which again is in Mr. Reese's case a particularly good example of the kind where you would expect to see a favorable response with the use of Prolastin.

On the basis of the information and studies supporting the FDA's approval of Prolastin, Dr. Fallat's clinical experience, and the specific information known to him about Reese's medical condition, Dr. Fallat concluded that, based upon reasonable medical probability, Prolastin therapy would be effective for Reese. Dr. Fallat further concluded that, had Dr. Stroh prescribed Prolastin for Reese as soon as it became available, the treatment would have "reduced the rate of decline by 50 percent".

After hearing the offer of proof, the trial court ruled that Dr. Fallat's testimony lacked the necessary scientific foundation and was therefore inadmissible. In light of the court's ruling, the Plaintiffs decided not to call their other expert witnesses, whose testimony would have been to the same effect. Dr. Stroh then moved for a directed verdict, which the trial court granted. This appeal followed.

## II

### DISCUSSION

### A

### Applicability of the *Frye* Standard in Civil Cases

The issue here is whether there was an adequate foundation for Dr. Fallat's expert opinion that Prolastin more probably than not would have improved Mr. Reese's condition. Before we can decide this issue, however, we must determine the proper standard or test for evaluating the admissibility of expert medical testimony. For the reasons discussed below, we

hold that the *Frye* rule[3] does not apply to expert testimony in civil cases. Even if it did, Dr. Fallat's testimony was admissible because the *methods* he used to reach his conclusion were generally accepted in the medical community.

■ Initially, we note that Washington courts, with one exception, have neither discussed nor applied *Frye* in the context of a civil case,[4] and the Supreme Court has never adopted *Frye* as the standard to be followed in civil cases. Rather, the Supreme Court has intimated that a *Frye* analysis is appropriate only in criminal and quasi-criminal cases. *See State v. Canaday*, 90 Wn.2d 808, 813, 585 P.2d 1185 (1978) (expressly adopting the *Frye* analysis for determining the admissibility of testimony based on scientific experimental procedures in *criminal* trials).[5] In *In re Johnston*, 109 Wn.2d 493, 498, 745 P.2d 864 (1987), the court noted that "[*Frye's*] rationale has been applied in the context of criminal trials, but not in the context of prison

---

[3]In *State v. Cauthron*, 120 Wn.2d 879, 886, 846 P.2d 502 (1993), the court reiterated its adherence in criminal cases to the test for determining whether evidence based on novel scientific procedures is admissible, set forth in *Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923). The *Frye* rule provides:

> [E]vidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community.

*Cauthron*, 120 Wn.2d at 886 (quoting *State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984)). In *Frye*, the District of Columbia Circuit excluded the use of polygraph evidence because the polygraph had not yet gained "general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014.

[4]*Burkett v. Northern*, 43 Wn. App. 143, 144, 715 P.2d 1159, *review denied*, 106 Wn.2d 1008 (1986) was an action to recover damages resulting from an auto accident, in which Division Three of the Court of Appeals applied the *Frye* rule to exclude expert medical testimony of "scientific experimental procedures" called thermography. We disagree with the approach taken in that case. We note that the *Burkett* court relied only on criminal cases and did not discuss why it was importing the *Frye* standard into the civil arena.

[5]The Supreme Court has also applied *Frye* in a quasi-criminal case, in which the defendant's loss of freedom was at stake. *In re Young*, 122 Wn.2d 1, 55-59, 857 P.2d 989 (1993) (civil commitment proceeding); *cf. In re Peterson*, 120 Wn.2d 833, 869, 846 P.2d 1330 (1993) (suggesting application of *Frye*-type rule to expert opinion in attorney disciplinary proceeding; however, the court did not cite *Frye* or discuss its application in the civil context).

disciplinary proceedings."[6] *See also* Paul C. Giannelli, *The Admissibility of Novel Scientific Evidence:* Frye v. United States, *a Half-Century Later*, 80 Colum. L. Rev. 1197, 1240 n.321 (1980) ("The overwhelming majority of cases involving the admissibility of novel scientific techniques have been criminal prosecutions.").

In rejecting the *Frye* test, we adopt the approach taken by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). There, the Court abandoned use of the *Frye* standard in favor of a more flexible approach under Fed. R. Evid. 702.[7] The Court explained:

> Nothing in the text of this Rule establishes "general acceptance" as an absolute prerequisite to admissibility. Nor does respondent present any clear indication that Rule 702 or the Rules as a whole were intended to incorporate a "general acceptance" standard. The drafting history makes no mention of *Frye*, and a rigid "general acceptance" requirement would be at odds with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." *Beech Aircraft Corp. v. Rainey*, 488 U.S. [153, 169, 102 L. Ed. 2d 445, 109 S. Ct. 439 (1988)].

*Daubert*, 113 S. Ct. at 2794. We agree with the *Daubert* Court that *Frye*'s "austere" standard is incompatible with the Rules of Evidence when applied in the civil context.

There are several policy reasons for rejecting the application of *Frye* in civil cases. First, *Frye* was originally adopted to prevent the use of "black boxes" or technologies that, because they are mechanical or mysterious, appear infallible

---

[6]In *Johnston*, the court rejected the petitioners' contention that it should apply a stricter evidentiary standard than the "some evidence" standard in a prison disciplinary proceeding. The court determined that, because the "some evidence" standard satisfied due process concerns, the urinalysis test results at issue there did not have to meet the *Frye* standard. *Johnston*, 109 Wn.2d at 497-99.

[7]Fed. R. Evid. 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." This is identical to Washington's ER 702.

to the average juror. *People v. Stoll*, 49 Cal. 3d 1136, 783 P.2d 698, 265 Cal. Rptr. 111 (1989); *People v. McDonald*, 37 Cal. 3d 351, 690 P.2d 709, 208 Cal. Rptr. 236 (1984). As the *McDonald* court stated:

> When a witness gives his personal opinion on the stand — even if he qualifies as an expert — the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently "scientific" mechanism, instrument, or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative.

37 Cal. 3d at 372-73. *See* Giannelli, at 1237 ("The major danger of scientific evidence is its potential to mislead the jury; an aura of scientific infallibility may shroud the evidence and thus lead the jury to accept it without critical scrutiny." (Footnote omitted.)).

Second, in a criminal case in which the State offers novel scientific evidence, the defendant's ability to rebut the prosecution's case with his own expert testimony may be the critical factor in a successful defense. *See United States v. Addison*, 498 F.2d 741 (D.C. Cir. 1974). However, criminal defendants often lack the economic means to retain scientific witnesses necessary to wage a "battle of the experts". Giannelli, at 1244. Because the introduction of novel scientific techniques has a greater potential of influencing the jury, it may also increase the likelihood of an erroneous jury verdict. *People v. Law*, 40 Cal. App. 3d 69, 75, 114 Cal. Rptr. 708, 712 (1974). As the court in *Law* stated: " '. . . we have strong feelings that [novel scientific evidence], particularly in a criminal case, must be critically examined in view of the substantial unfairness to a defendant which may result from ill conceived techniques with which the trier of fact is not technically equipped to cope.' " 40 Cal. App. 3d at 75 (quoting *People v. Collins*, 68 Cal. 2d 319, 332, 66 Cal. Rptr. 497, 505 (1968)). In view of the inherent disadvantages a criminal defendant faces and the difficult task of defending

against evidence derived from seemingly infallible scientific techniques, application of the *Frye* standard serves as a necessary safeguard in criminal cases in which we must be particularly careful to assure that those who are innocent are not convicted and imprisoned.

Third, a criminal defendant is constitutionally guaranteed the right to a fair trial, and the State must prove the defendant's guilt beyond a reasonable doubt. The prosecution should not be permitted to prove its case through the use of less than highly reliable methodologies and techniques. Consequently, we require an added measure of assurance that the basis for the conviction is reliable and accurate. *Law*, 40 Cal. App. 3d at 85.

By contrast, in a civil case, the jury weighs the evidence presented through experts on a preponderance of the evidence standard, and defendants generally have greater resources to counter the plaintiff's evidence of causation. Of course, the evidence presented in a civil case must still be reliable. However, we believe that the Rules of Evidence, having been purposely designed to assure that testimony admitted into evidence is reliable and accurate, are a sufficient safeguard in civil cases.

## B

### Admissibility of the Expert Testimony Under the Civil Rules

■ Having determined that the *Frye* standard should not be applied in civil cases, we now analyze Dr. Fallat's testimony under the applicable Rules of Evidence. ER 702 and 703 govern the admissibility of expert opinion testimony. In *Daubert*, the Supreme Court held that a trial judge should act as a "gatekeeper" to ensure that all scientific evidence[8] admitted is both relevant and reliable. 113 S. Ct. at 2795. In performing this gatekeeping responsibility, the judge should focus primarily on ER 702, which allows admission of "scientific . . . knowledge" which will "assist" the trier of fact. The

---

[8]*Daubert* applies to an examination of all scientific methods and techniques, novel or well accepted. *See* 113 S. Ct. at 2796 n.11.

term "scientific" implies a grounding in the methods and procedures of science, and "knowledge" connotes more than a subjective belief or unsupported speculation. 113 S. Ct. at 2795. The Court continued:

> Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty . . .. But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation — *i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

113 S. Ct. at 2795.

■ The second part of the analysis focuses on whether the scientific testimony will assist the trier of fact to understand or determine a fact in issue. This requires the trial court to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." 113 S. Ct. at 2796. This entails consideration of several factors, including whether a theory or technique can be and has been tested and whether it has been subjected to peer review and publication. Also relevant is the known or potential rate of error in the case of a particular scientific technique. Finally, "general acceptance" also bears on the court's inquiry, although the court is not required to identify a relevant scientific community and determine the degree of acceptance of the theory or technique within that community. 113 S. Ct. at 2796-97.

■ Before analyzing the admissibility of Dr. Fallat's testimony, we emphasize that the inquiry under ER 702 is a "flexible" one which focuses solely on principles and methodology, not on the expert's conclusions. 113 S. Ct. at 2797. *See also* Kenneth J. Chesebro, *Taking* Daubert's *"Focus" Seriously: The Methodology/ Conclusion Distinction,* 16 Mealey's Litig. Rep. 14 (1993) ("The Court's instructions are quite clear: Rule 702 authorizes courts to scrutinize only the 'scientific validity' of the *'principles and methodology'* used

by an expert — not the persuasiveness of the 'conclusions' so generated." (Italics ours.)).

Here, the Reeses support their position that Dr. Fallat's testimony is based on valid scientific methodologies and principles by relying on (1) the FDA approval of Prolastin for treatment of AAT-deficient patients; and (2) Dr. Fallat's clinical experience with 35 to 40 such patients, about half of whom are on Prolastin therapy. Dr. Stroh contends that Dr. Fallat's conclusion that Prolastin was likely to be effective in treating Reese's emphysema is not "scientific knowledge" because it is based on pure speculation. We disagree.

In analyzing Dr. Fallat's theory under *Daubert*, a key factor is testing. As noted above, the FDA released Prolastin based on a consensus among physicians who had studied AAT deficiency and the augmentation of AAT in treating patients with the deficiency. Use of the drug was approved without a study yielding statistical proof that it would be therapeutic in treating emphysema in AAT-deficient patients because the NIH and FDA physicians believed that such a study would never be done. However, the FDA's approval was not based on speculation that Prolastin would likely be effective in treating emphysema in AAT-deficient patients. The studies to date had demonstrated that AAT therapy was effective in raising serum levels in AAT-deficient patients to normal levels, and that severely AAT-deficient patients were most likely to develop lung disease.[9] In addition, replacement therapy has proved valuable in treating "diverse inherited serum protein deficiencies [such] as hemophilia, hypogammaglobulinemia, and hereditary angioedema and, according to the present NIH study, seems to

---

[9]*E.g.*, Wewers, at 1055 ("This study demonstrates that infusions of [AAT] derived from plasma are safe and can reverse the biochemical abnormalities in serum and lung fluid that characterize this disorder."); James E. Gadek & Ronald G. Crystal, *Experience With Replacement Therapy in the Destructive Lung Disease Associated With Severe Alpha-1-Antitrypsin Deficiency*, 127 Am. Rev. Respiratory Disease S45 (Supp. 1983); C.A. Guenter et al., *Current Status of Alpha 1 Antiprotease Replacement Therapy: Guidelines for the Canadian Thoracic Society*, 2 Airwaves 11, 13 (1991) ("Parenteral therapy with [AAT] has been demonstrated to provide serum levels of [AAT] above the threshold levels of [AAT] thought to be needed to prevent the development of emphysema.").

provide a safe and effective continuous maintenance therapy in [AAT] deficiency." National Institutes of Health, at 1693. From this data, Dr. Fallat and the other expert physicians in the NIH working group concluded that Prolastin would probably be effective in at least slowing the deterioration of lung function in patients with AAT deficiency. While the studies to date cannot prove this conclusion with statistical certainty, their findings strongly support it.

■ Further, Dr. Fallat's clinical results in treating 35 to 40 AAT-deficient patients, half of whom are on Prolastin, provide additional support for his theory. Those results show that the treatment has been effective in slowing the progression of lung disease. Dr. Stroh argues that these clinical results are meaningless because Dr. Fallat himself dismissed two small studies showing that Prolastin had been ineffective for patients with severe AAT deficiency. Those studies involved 6 and 59 patients, respectively. Regarding the study of 59 patients, Dr. Fallat opined that the study's failure to show the drug's effectiveness was probably due to a "beta error", explaining that "[t]he statistical studies give you errors in both directions". In any event, that other studies reached different conclusions does not affect the testimony's admissibility. What is significant here is that Dr. Stroh did not present any other scientific literature to contradict Dr. Fallat's testimony. Dr. Fallat testified concerning what was known at the time in the medical and scientific community about AAT deficiency and AAT therapy. It is the jury's province to determine the weight to be given conflicting opinion testimony. *See Intalco Aluminum Corp. v. Department of Labor & Indus.*, 66 Wn. App. 644, 660-62, 833 P.2d 390 (1992), *review denied*, 120 Wn.2d 1031 (1993).

Another relevant factor in the ER 702 analysis is whether the scientific theory has been subject to peer review and publication. As demonstrated above, AAT deficiency has been thoroughly studied and reviewed by experts in the field.[10] Also

---

[10]Since Dr. Fallat did not rely on any particular scientific "technique" (*e.g.*, the use of spectrographic analysis), the "known or potential rate of error" does not factor into our analysis. *See Daubert*, 113 S. Ct. at 2797.

relevant, though not determinative, is whether a theory or technique has gained "general acceptance". To the extent that AAT therapy with Prolastin is a feasible, though not scientifically validated, treatment for patients like Reese, it has gained general acceptance. This is clearly reflected in the FDA's approval of the drug and in the scientific literature.

■ Based on the foregoing, we conclude that Dr. Fallat's opinion testimony is grounded in "scientific knowledge", "based on what is known". *Daubert*, 113 S. Ct. at 2795. That "science has [not] had the time and resources to complete sophisticated laboratory studies" of Prolastin's effectiveness in treating AAT-deficient patients does not preclude the admissibility of causation testimony, "[a]s long as the basic methodology employed to reach . . . a conclusion is sound". *Intalco*, 66 Wn. App. at 661 (quoting *Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1535-36 (D.C. Cir.), *cert. denied*, 469 U.S. 1062 (1984)).

In addition to being reliable, Dr. Fallat's reasoning and methodology can clearly be applied to the facts in issue. The testimony therefore meets the second part of the test under ER 702, *i.e.*, the requirement that the testimony assist the trier of fact in determining whether Dr. Stroh's failure to treat Reese's emphysema with Prolastin was negligent. 113 S. Ct. at 2795. We emphasize that the trial court found no fault with the methodology used by Dr. Fallat. Nor does Dr. Stroh complain that the studies or clinical experience relied on by Dr. Fallat were in any way flawed. The focus is properly on Dr. Fallat's methodologies, not his conclusions, and these were unquestionably considered "generally accepted in the scientific community". *Intalco*, 66 Wn. App. at 662; *Daubert*, 113 S. Ct. at 2797.

Finally, we note that Dr. Stroh cites no case in which a court has required statistical proof before expert medical testimony on causation can be admitted, and the case law demonstrates that expert opinions based on controversial scientific theories are admissible as long as the expert's techniques and methodologies are sound. *Intalco*, 66 Wn. App. at 661-62 (a cause-effect relationship need not be proved by

epidemiological studies before a doctor can testify to his opinion that such a relationship exists); *Ferebee*, 736 F.2d at 1535-36; *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."). Accordingly, we hold that the fact that no study has statistically proved Prolastin to be therapeutically effective in treating lung disease affects the weight, not the admissibility, of Dr. Fallat's testimony.[11]

■ At oral argument, Dr. Stroh argued that Dr. Fallat's testimony also failed to meet the requirement of ER 703 that the facts or data underlying the expert's opinion be of a type reasonably relied on by experts in the field. This argument misconstrues the purpose of the rule. ER 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

According to the Judicial Council Task Force comment on ER 703, the rule (1) codifies the principle that an expert may base an opinion on either firsthand information or information presented to him at trial; and (2) permits an expert to give an opinion based on facts or data *not otherwise admissible in evidence*, provided that the underlying facts or data are of a type reasonably relied upon by experts in the particular field. Thus, an ER 703 analysis is appropriate when the expert's testimony is based on facts which are hearsay and therefore inadmissible as independent evidence. *Daubert*, 113 S. Ct. at 2797-98; *Department of Fisheries v. Gillette*, 27 Wn. App. 815,

---

[11]Dr. Stroh repeatedly argues in his brief that even Dr. Fallat acknowledges that population studies are needed to prove Prolastin's therapeutic efficacy. This argument takes Dr. Fallat's testimony out of context. He clearly emphasized that treatment decisions are based on many different criteria. Physicians make treatment decisions even though no population studies are available to support those decisions.

824-25, 621 P.2d 764 (1980). Because the defense did not challenge Dr. Fallat's testimony on the ground that it was based on hearsay, ER 703 is not applicable here.[12]

Dr. Stroh also argues that the expert testimony was properly excluded under ER 403 because the "glamour" of the experts was likely to mislead the jury and shroud the evidence. This argument is not persuasive. Dr. Fallat's testimony was not based on a mysterious and apparently sophisticated technology that carried with it an aura of infallibility. Instead, he testified on the basis of scientific data known to the medical profession at the time Mr. Reese was seeking treatment for his condition. This evidence is the type of information jurors and their physicians rely on in their everyday lives to make decisions about health care. There is nothing mystical about it, and jurors are perfectly capable of determining what weight to give this kind of expert testimony. It is the jury's province to decide whether a reasonable physician would have treated Mr. Reese's AAT deficiency with Prolastin given the quality and quantity of data that was known to the medical profession at the time. Whether the Reeses have presented enough evidence to show that Dr. Stroh was negligent should be decided by the jury. If the trial court determines at the close of the Plaintiff's case that the quantum of evidence presented is insufficient to allow a reasonable juror to conclude that Prolastin more likely than not would have slowed the deterioration of Reese's lung function, it remains free to direct a verdict.[13] *Daubert*, 113 S. Ct. at 2798.

---

[12]Even if we were to construe ER 703 as requiring that all facts and data underlying an expert's opinion be "of a type reasonably relied upon by experts in the particular field", Dr. Fallat's testimony would satisfy this requirement because the methods he used to reach his conclusion are generally accepted in the scientific community.

[13]As the discussion above demonstrates, the focus under either *Frye* or ER 702 is on the expert's methods, not his or her conclusions. Thus, even if the *Frye* standard were applicable in civil cases such as this one, Dr. Fallat's testimony would still be admissible because his conclusions were grounded in generally accepted methodologies. *Daubert*, 113 S. Ct. at 2795-97; *Intalco*, 66 Wn. App. at 661-62.

The parties and amici refer in their briefs to Dr. Fallat's testimony that proper Prolastin therapy would have reduced Mr. Reese's "rate of decline by 50 percent". Dr. Stroh asserts that there was inadequate foundation for that opinion, and Mr. Reese asserts that it was sufficient. However, neither party argues this as an issue distinct from the admissibility of Dr. Fallat's testimony generally. Nor was the issue developed in the trial court where the focus of the offer of proof was on the admissibility of the testimony about Prolastin as a treatment for AAT deficiency. Under these circumstances, we believe it would be inappropriate for us to rule on appeal on the admissibility of the testimony before the parties and the trial court have had an opportunity to focus on it. On remand, the Reeses may again offer this opinion, together with whatever foundation they wish to adduce. It will then be up to the trial court to determine whether the foundation for this opinion is sufficient based on applicable evidence rules and the guidelines set out in this opinion.

Finally, because we are reversing and remanding for trial, we do not reach the jury trial issue Appellants raised in their brief.

The judgment is reversed.

KENNEDY and BECKER, JJ., concur.

Review granted at 124 Wn. 2d 1018 (1994).