[Nos. 25923-7-I; 25945-8-I;  Division One.  July 27, 1992.]
25946-6-I.

INTALCO ALUMINUM CORPORATION, *Appellant,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, ET AL, *Respondents.*

646

*Wayne L. Williams, James L. Rolland,* and *Rolland, O'Malley & Williams, P.S.; David M. Jacobi* and *Wilson, Smith, Cochran & Dickerson,* for appellant.

*Martha V. Gross* and *Knies & Robinson; James D. Hailey* and *Schroeter, Goldmark & Bender P.S.,* for respondents.

AGID, J. — This appeal arises out of a claim for workers' compensation benefits by three workers who contend they became disabled as a result of long-term exposure to toxic substances at the Intalco Aluminum plant. Intalco Aluminum Corporation (Intalco), a self-insured employer, appeals the judgment in favor of the claimants, primarily contending that the medical evidence is insufficient to support the jury's finding that the claimants' injuries were proximately caused by exposures in the Intalco plant. We affirm.

I
FACTS
A. Procedural History.
On August 11, 1983, James Snydar, Ted Oppewall and Robert Walker filed accident reports with the Department of Labor and Industries (DLI), alleging that they had sustained an occupational disease during the course of their employment with Intalco. In July 1984, DLI rejected their claims for benefits under the Industrial Insurance Act. The claimants subsequently appealed the order to the Board of Industrial Insurance Appeals (the Board), and the Board

heard the three claims in a consolidated proceeding. On April 18, 1986, the industrial appeals judge entered a proposed decision and order recommending that all three claims be allowed. The order concluded that the claimants sustained occupational diseases as a result of exposure to air pollution in the Intalco plant pot rooms.[1] Intalco filed a petition for review with the Board, and the Board denied the petition, adopting the recommendation of the industrial appeals judge.

After the Board denied Intalco's petition for review, Intalco appealed the Board's order to superior court pursuant to RCW 51.52.110. The three cases were again consolidated for hearing. Intalco brought two motions for summary judgment, arguing that the claimants' medical evidence was insufficient as a matter of law to support the Board's award of compensation. The trial court denied both motions. The record of proceedings was presented to a jury, which returned a verdict in favor of the claimants.[2] The trial court subsequently denied Intalco's motion for judgment notwithstanding the verdict or for a new trial. Intalco's appeal followed.

B. The Claimants' Working Conditions.

Each of the claimants worked for at least 12 years in the aluminum reduction "potline" at Intalco. Mr. Oppewall and Mr. Walker began working at the plant as pot operators in 1966 and 1967 respectively. Mr. Snydar, who began working at Intalco in 1966, worked above the pot room cleaning the air pollution control scrubber units. When the plant began operations in 1966, there were no primary emission controls, or "hoods", covering the pots. Prior to 1972, the only emission control system in place was a wet scrubber system located in the roof of the building. It cleaned the pot room fumes from

---

[1] Within the Intalco plant, there are six buildings that each contain two pot rooms. The pot rooms house electrolytic cells, or pots, connected in series. Each pot is a fabricated steel shell 15 feet wide, 25 feet long, and 4 feet deep, and produces about a ton of aluminum per day.

[2] *See* RCW 51.52.115. Under the statute, the transcript of proceedings before the Board is read by the trial court or to a jury. The factfinder thus has no opportunity to judge the demeanor and credibility of the witnesses.

the air before they were expelled into the atmosphere, but after the workers had been exposed to the pot fumes. Mr. Oppewall testified that the working conditions were so dusty and gassy at times that he could not see 100 to 200 feet in front of him. The workers were also responsible for cleaning the work area at the end of their shifts. They were covered with carbon and ore dust by the end of their work day. In 1972, Intalco began installing hoods over the pots, which drew the effluent out of the pots directly into a dry scrubber system. However, when the pots were being worked on, the hoods were open and the workers were exposed to the same fumes they were exposed to before the hoods were installed.

Intalco presented the testimony of Arvin Apol, an industrial hygienist for the National Institute for Occupational Safety and Health (NIOSH). In 1973, NIOSH did an air pollution survey of gasses and particulates at the Intalco plant. At that time, Intalco was in the process of retrofitting the pots with hoods. Apol testified that the air on the unhooded potline was at least twice as dirty as the air on the hooded potline. The survey, which focused primarily on fluoride emissions, found that the threshold limits for that toxin were exceeded on both the hooded and unhooded potlines. However, NIOSH did not measure all of the chemicals present in the Intalco pot room atmosphere, such as aluminum particulates. Apol testified that numerous toxins, including aluminum, benzene solubles, petroleum pitch volatiles, and carbon monoxide would also be present in the pot room atmosphere. He further testified that carbon monoxide and petroleum pitch volatiles had been associated with neurologic disease.

C. The Claimants' Medical Histories.

1. *James Snydar.*

In April 1982, James Snydar's physicians referred him to the Occupational Medicine Clinic at Harborview hospital for an evaluation to determine whether his illness was work related. The director of the clinic, Dr. Linda Rosenstock, conducted the initial evaluation. Mr. Snydar reported that, over the years, he had experienced increasing difficulty with

his coordination, trembling in his upper extremities, and an unsteady gait. Dr. Rosenstock and her staff conducted a thorough review of Mr. Snydar's medical history and history of exposure to potential neurotoxic agents both within and outside of his work environment at Intalco. The investigation included extensive, systematic medical testing, including nervous system studies, vitamin deficiency tests, and other procedures specifically intended to identify any non-work-related causes of illness.

Dr. Rosenstock's preliminary assessment was that Mr. Snydar was suffering from an atypical neurologic disease. She diagnosed the disease as atypical on the basis that his symptoms did not meet the criteria for other types of progressive neurological illness. Upon learning that two other Intalco pot room workers were experiencing symptoms similar to Mr. Snydar's, Dr. Rosenstock became suspicious that the illnesses might be work related.

2. *Robert Walker.*

Robert Walker came to Dr. Rosenstock complaining of symptoms similar to those reported by his co-worker, Mr. Snydar. Like Mr. Snydar, Mr. Walker complained of generalized weakness, problems with balance causing an unsteady gait, and trembling in his upper extremities. Although Mr. Walker had been seen by a number of neurologists before Dr. Rosenstock, his prior diagnoses did not fit the usual diagnostic criteria for other suspected diseases.[3]

3. *Ted Oppewall.*

Ted Oppewall was the third Intalco pot room worker examined by Dr. Rosenstock. Although Mr. Oppewall seemed the least ill, he suffered many of the same symptoms as the other two men. Like Mr. Snydar and Mr. Walker, Mr. Oppe-

---

[3]Mr. Walker had been diagnosed as suffering from amyotrophic lateral sclerosis, also known as ALS or Lou Gehrig's disease. However, Dr. Rosenstock believed this was an unlikely diagnosis given that the disease usually progresses to death within 7 years of diagnosis. Not only had Mr. Walker long outlived this period, but his medical history showed that his symptoms had stabilized and were not progressing toward the fatal outcome associated with ALS. Dr. Rosenstock also ruled out the diagnosis of multiple sclerosis. She saw no evidence of lesions and other symptoms associated with MS.

wall had problems with coordination, unsteady gait, and trembling in his upper extremities.

### D. Dr. Rosenstock's Consultation With Dr. Longstreth.

Struck by the similarities in both work exposures and symptoms displayed by the three patients, and unable to place a definitive diagnosis on their illnesses, Dr. Rosenstock referred them to Dr. William Longstreth, head of Neurology at the Pacific Medical Center, for a detailed neurological workup. The two physicians conducted an intensive evaluation of the three patients over a 2-year period. Under the direction of Dr. Longstreth, the three underwent a series of neurophysiological, neuropsychological, blood, and urine tests. Dr. Longstreth confirmed Dr. Rosenstock's preliminary assessment that the patients were not suffering from multiple sclerosis, ALS, or any other known neurologic disease.

Although the symptoms differed in severity from one patient to the next, the neurological symptoms exhibited by each were remarkably similar. In addition to the coordination, balance and tremor problems found by Dr. Rosenstock, Dr. Longstreth's testing revealed that the three men suffered impaired cognitive functioning, ranging from mild to severe impairment. This cognitive impairment caused them to have problems with short-term memory and visual motor speed tasks. Dr. Longstreth testified that these cognitive problems were commonly seen in patients exposed to a number of neurotoxins, especially heavy metals and solvents. Dr. Longstreth believed that the differences in severity of impairment found in the three men could be due to the differences in the extent to which the disease had progressed in each man. The differences could also reflect individual susceptibilities to the same neurotoxin in the pot room environment.

Counsel for Intalco questioned Dr. Longstreth about whether other events in the patients' medical histories might be the cause of or explain their symptoms of neurologic disease. For example, in 1977, Mr. Oppewall suffered an episode of aseptic meningitis, which is the inflammation

of the lining around the brain. He recovered from the meningitis, but his problems with balance and loss of memory worsened. Because his neurologic symptoms predated the episode of meningitis and progressed after his recovery from that illness, Dr. Longstreth did not believe the illness was the cause of Mr. Oppewall's medical problems.[4]

At the age of 13, Mr. Walker was diagnosed as having a neurologic condition called St. Vitus' Dance. This episode was characterized by left-sided weakness, followed by uncontrolled movements. After Mr. Walker underwent chiropractic treatment for a 6-month period, the symptoms associated with the childhood illness disappeared. Dr. Longstreth could not tie that episode in with Mr. Walker's other adult-onset neurologic problems.

With respect to Mr. Snydar's medical history, Intalco's counsel observed that his I.Q. was significantly lower than the I.Q.'s of the other two men. In Dr. Longstreth's opinion, however, the I.Q. testing was inconclusive as a cause of his neurologic symptoms. He testified that Mr. Snydar's difficulties with problem solving, poor memory and deficiencies in completing visual spatial tasks could not be explained solely on the basis of a low I.Q.

Drs. Longstreth and Rosenstock determined that the patients' neuropathological process affected their central, rather than peripheral, nervous systems. On the basis of this determination, the physicians eliminated from consideration numerous non-work-related causes.[5] Drs. Longstreth and Rosenstock concluded that the three patients' illnesses were more probably than not caused by work-related exposures to neurotoxins. They based their conclusion on the similarity of the patients' symptoms, which were

---

[4]Further, the symptoms associated with Mr. Oppewall's meningitis included headaches, a stiff neck, body aches and other viral symptoms. The neurologic problems detected by Dr. Longstreth manifested themselves in very different symptoms.

[5]For example, they ruled out other neurotoxins unrelated to occupational exposure such as lead poisoning and insecticides.

characteristic of a neurologic disease, and their exposure histories. Especially in the early years of their employment, all three had intense exposures to a number of toxic substances, including solvents, fluorides, aluminum, and coal tar pitch, and all three were exposed to the same work environment for at least 12 years. The physicians observed that the patients' symptoms revealed a neurologic disease that could not be explained as any other known disease or by commonly accepted disease criteria. Finally, they agreed that, as a central nervous system phenomenon, the disease looked like other models of toxin-induced disease known as "central distal axonopathy".

## II
### DISCUSSION
A. Sufficiency of the Evidence.

Intalco first contends that the evidence was insufficient as a matter of law to send the case to the jury on the issue of whether the claimants' medical conditions were proximately caused by exposure to toxic substances in their work environment.[6] In challenging the sufficiency of the evidence, Intalco must admit the truth of the claimants' evidence and all inferences that can reasonably be drawn therefrom. *Spino v. Department of Labor & Indus.*, 1 Wn. App. 730, 731, 463 P.2d 256 (1969), *review denied*, 77 Wn.2d 962 (1970); *see also Sepich v. Department of Labor & Indus.*, 75 Wn.2d 312, 321, 450 P.2d 940 (1969). In applying this standard, the trial and appellate courts must interpret the evidence in favor of the claimants and against the defendant. *Spino*, 1 Wn. App. at 731. Further, the findings and decisions of the Board are deemed to be prima facie correct. RCW 51.52.115; *Department of Labor & Indus. v. Estate of MacMillan*, 117 Wn.2d 222, 227, 814 P.2d 194 (1991). The jury's verdict upholding the Board's findings and decision must also be presumed correct. *Sacred*

---

[6]Intalco's challenge to the sufficiency of the evidence encompasses three assignments of error, arguing that the trial court erred in: (1) denying its motions for summary judgment; (2) denying its motion for directed verdict; and (3) denying its motion for judgment notwithstanding the verdict or a new trial.

*Heart Med. Ctr. v. Carrado*, 92 Wn.2d 631, 635, 600 P.2d 1015 (1979).

■ The Industrial Insurance Act (the Act) was intended to provide relief "for workers, injured in their work, and their families and dependents . . . regardless of questions of fault and to the exclusion of every other remedy". RCW 51.04.010; *Dennis v. Department of Labor & Indus.*, 109 Wn.2d 467, 470, 745 P.2d 1295 (1987). To serve this goal of providing compensation to all covered workers injured in their employment, the Act should be liberally construed, with all doubts resolved in favor of the worker. *Dennis*, 109 Wn.2d at 470; *Estate of MacMillan*, 117 Wn.2d at 232.

■ ■ A worker suffering a disability from an occupational disease is entitled to receive compensation benefits under the Act. RCW 51.32.180. "Occupational disease" is defined as "such disease or infection as arises naturally and proximately out of employment". RCW 51.08.140. A disease is "proximately" caused by conditions of employment when "there [is] no intervening independent and sufficient cause for the disease, so that the disease would not have been contracted but for the condition existing in the . . . employment." *Simpson Logging Co. v. Department of Labor & Indus.*, 32 Wn.2d 472, 479, 202 P.2d 448 (1949). To show that his or her medical condition arose "naturally" out of employment:

> [t]he worker . . . must show that his or her particular work conditions more probably caused his or her disease or disease-based disability than conditions in everyday life or all employments in general; the disease or disease-based disability must be a natural incident of conditions of that worker's particular employment.

*Dennis*, 109 Wn.2d at 481.

■ In workers' compensation cases, the court must give special consideration to the opinion of the attending physician. *Hamilton v. Department of Labor & Indus.*, 111 Wn.2d 569, 571, 761 P.2d 618 (1988). This is because an attending physician is not an expert hired to give a particular opinion consistent with one party's view of the case. A physician's opinion as to the cause of the claimant's disease is sufficient

when it is based on reasonable medical certainty even though the doctor cannot rule out all other possible causes without resort to delicate brain surgery. *Halder v. Department of Labor & Indus.*, 44 Wn.2d 537, 543-45, 268 P.2d 1020 (1954). The evidence is sufficient to prove causation if, from the facts and circumstances and the medical testimony given, a reasonable person can infer that a causal connection exists. *Douglas v. Freeman*, 117 Wn.2d 242, 252, 814 P.2d 1160 (1991); *Carrado*, 92 Wn.2d at 636-37.

In arguing that the claimants' medical evidence was insufficient to support the jury's finding of proximate cause, Intalco first asserts that Drs. Longstreth and Rosenstock failed to make a diagnosis of the claimants' illnesses. After reviewing the physicians' testimony, however, we conclude that they did make a definitive diagnosis. The physicians studied the claimants over a period of 2 years, conducting numerous neurological tests during that time. Based on their findings, the physicians concluded that their symptoms did not fit the commonly accepted criteria of any known, neurologic disease. However, their findings established that the symptoms displayed by all three patients, including difficulty with coordination, tremors, balance and gait problems, and cognitive impairment, indicated a disorder of the central nervous system. The physicians diagnosed this disease as "central distal axonopathy".

Intalco also believes the medical testimony was insufficient because the physicians could not identify the specific toxic agent or agents that proximately caused the claimants' disease. Intalco's witness, Mr. Apol of NIOSH, identified several toxins in the pot room, some of which have been associated with neurologic disease. While the physicians could only hypothesize that aluminum could be the *specific* agent responsible for the claimants' disease, they firmly concluded that a toxin or a combination of toxins present in the atmosphere of the Intalco pot room more probably than not caused the claimants' neurologic disease. This conclusion was based on several factors. First, although the clinical findings indicated that the patients suffered from

a neurologic disease, their symptoms did not fit the diagnostic criteria of any known disease. Second, the claimants all had similar exposures to known neurotoxins: they had all worked in the pot room for at least 12 years. Third, the physicians' extensive investigations of the claimants' medical and work histories revealed no other likely cause of their disease. Finally, while studies of the effects of pot room exposures on the human neurologic system had never been done, animal studies revealed that aluminum exposure could cause symptoms similar to those exhibited by the claimants. This medical testimony establishes a sufficient basis for the physicians' conclusion that exposure to a toxin or a combination of toxins in the Intalco pot room more probably than not caused the claimants' disease.

Intalco cites no authority for the proposition that the claimants must identify the specific causative agent responsible for their occupational disease. Under the Act, the claimant need only show that his or her disability or disease arose from distinctive conditions of his or her employment. *Dennis*, 109 Wn.2d at 481. These claimants' exposure to a variety of known neurotoxins in the pot room is a distinctive condition of their employment. The evidence demonstrates that exposure to neurotoxins in the pot room more probably caused the claimants' disease-based disabilities than conditions in everyday life or all employments in general. *Dennis*, at 481. In light of the Legislature's mandate to construe the Act liberally in favor of the worker seeking compensation, we decline to read into the workers' compensation statute a requirement that the claimant identify the specific toxic agent responsible for his or her disease or disability. *See Lightle v. Department of Labor & Indus.*, 68 Wn.2d 507, 413 P.2d 814 (1966) (courts should refrain from narrowly construing provisions of the Act where such an interpretation results in the denial of benefits and statutory language does not suggest that the Legislature intended such a narrow interpretation).

We note that courts in other jurisdictions have declined to require the injured plaintiff in toxic tort products liability

cases to prove the precise chemical that caused his or her injury. *Earl v. Cryovac*, 115 Idaho 1087, 772 P.2d 725 (Ct. App. 1989); *In re Robinson*, 78 Or. App. 581, 717 P.2d 1202 (1986). In *Earl*, the Court of Appeals of Idaho reversed a summary judgment in favor of the manufacturer, holding that the plaintiff presented sufficient evidence to allow a jury to conclude that his lungs were injured as a result of exposure to vapors emitted from a plastic film used in the meat-packing room where he worked. The plaintiff's attending physician suspected that polyvinyl chloride, a chemical commonly found in plastic films, was a "significant" factor in the plaintiff's disease. However, rather than resting his opinion on the existence of that particular chemical, the physician believed that it was likely that a combination of chemicals caused the plaintiff's disease. *Earl*, at 1092. The manufacturer challenged the attending physician's opinion, arguing in part that the doctor failed to specify the particular component(s) of the plastic vapors which caused the plaintiff's disease. The court rejected this argument, stating:

> We do not consider it fatal to the plaintiff's case that the etiology of his disease has not been traced to a discrete component or set of components within the heated plastic vapor. As explained by our Supreme Court in *Farmer v. International Harvester Co.*, [97 Idaho 742, 553 P.2d 1306 (1976)], the plaintiff need only show that the product is unsafe; he need not identify and prove the specific defects which render it unsafe. The same approach is reflected in the cases cited at footnote 2, where victims of "meatwrapper's asthma" have been allowed to recover despite scientific uncertainty as to the precise etiological link between their disease and specific chemical(s) in the heated plastic vapors.

*Earl*, at 1095.

In *Robinson*, a furniture store employee sought workers' compensation benefits, claiming that exposure to toxic chemicals in the furniture store where she worked caused her to suffer from headaches, fatigue and dizziness. The claimant testified that the store continually received new furniture which was uncrated weekly in the furniture showroom. The evidence also showed that new furniture goes through a "gassing out" process whereby it releases quanti-

ties of formaldehyde, phenol and hydrocarbons over a period of time. The claimant also testified that the showroom in which she began working was hot, poorly ventilated and had low ceilings. When she worked in another warehouse with adequate ventilation and higher ceilings, her symptoms abated. *Robinson*, at 583. The employer's insurer argued that the claimant could not show that her work conditions caused her symptoms because living in a mobile home and having new carpet installed had exposed her to formaldehyde. The Court of Appeals of Oregon found, however, that the claimant met her burden of proving that chemical exposure at work was the major contributing cause of her disease. The court further ruled that the claimant was not required to pinpoint the precise chemical that caused her sensitivity:

> To recover, a claimant must prove that the conditions at work were the major contributing cause of the disability. Although the specific chemical cause of claimant's sensitivity is not conclusively established, she has shown by a preponderance of the evidence that the major contributing cause was her work environment at Struthers, which exposed her to concentrations of chemicals much greater than she was ordinarily exposed to outside the course of employment.

(Citations omitted.) *Robinson*, at 588.

We agree with the *Earl* court that the plaintiff should not be denied recovery simply because the precise etiological link between the plaintiff's disease and a specific toxin or toxins in the workplace has not yet been made. Further, we find the reasoning in *Robinson* persuasive. Because the claimant is only required to demonstrate that conditions in the workplace more probably than not caused his or her disease or disability and because we are to construe the Act liberally in favor of the claimant, we hold that the workers' compensation statute does not require the claimant to identify the precise chemical in the workplace that caused his or her disease.[7]

---

[7]Intalco's reliance on *Tonkovich v. Department of Labor & Indus.*, 31 Wn.2d 220, 195 P.2d 638 (1948) and *Boyer v. Department of Labor & Indus.*, 160 Wash. 557, 295 P. 737 (1931), is misplaced. In *Tonkovich*, the claimant alleged that his abdominal cancer was caused by a work-related foot injury. The court ruled that

Finally, Intalco argues that the claimants' medical evidence is insufficient as a matter of law because no other studies of neurologic disease and aluminum plant workers exist to substantiate the medical experts' theory that aluminum was the causative agent involved in the claimants' disease.[8] Thus, Intalco contends, the physicians' causation conclusion was based on a purely speculative theory. This argument ignores the fact that, in making their determination that the claimants' disease was more probably than not due to workplace exposures, Drs. Longstreth and Rosenstock did not rely solely on their theory that aluminum may have been the causative agent involved. While the physicians relied in part on animal studies showing a direct connection between aluminum exposure and neurologic disease, they also testified that before they could be *medically* certain that aluminum was the causative agent, further studies would have to be done. The crucial point here is that the physicians did not conclude that *aluminum* prob-

---

the evidence was insufficient to prove causation on the ground that the physician gave no basis for his tentative conclusion that the cancer was caused by an aggravation of the foot injury. 31 Wn.2d at 225-27. Similarly, in *Boyer*, the claimant was diagnosed with chronic lymphatic leukemia, which he contended was caused by an aggravation of a foot injury sustained at work. Four of the physicians who testified concluded that the disease was not caused by the foot injury. Further, the physician whose opinion the claimant relied on most heavily admitted that the leukemia could have preceded the injury. Examining this testimony in light of the fact that the cause of leukemia was unknown, the court concluded that the claimant had not sustained his burden of proving that the foot injury caused the leukemia. *Boyer*, 160 Wash. at 561-62. Neither *Tonkovich* nor *Boyer* stands for the proposition that the claimant must prove the precise chemical in the workplace that caused his or her medical condition. Rather, these cases hold that, in order to support a finding of proximate cause, the testifying physician must conclude that the claimant's illness was more probably than not caused by a work-related condition and provide a sufficient basis for that opinion.

[8]Intalco concedes that the *methods* used by Drs. Longstreth and Rosenstock in diagnosing the claimants' disease were methods of clinical examination and laboratory testing generally accepted in the scientific community. Nevertheless, the claimants view Intalco's argument as a challenge to the admissibility of the medical testimony based on lack of foundation. *See* ER 702, 703. In view of Intalco's recognition that the foundation was proper, we will not address the claimants' argument on this ground.

ably caused the claimants' disease. Rather, they concluded that some exposure to toxic substances in the Intalco pot room, one of which could be aluminum, resulted in their disabilities. As we held above, the physicians were not required to pinpoint a specific toxin as the basis for their conclusion that pot room exposures were more probably than not the cause of the claimants' disease.

■ The absence of studies linking aluminum plant pot room exposure to neurologic disease does not compel the conclusion that the claimants failed to make a showing of proximate cause. Apol acknowledged that every year the medical profession discovers that "new" diseases, which were previously thought to have unknown or non-work-related causes, are in fact occupationally related. Further, Dr. Rosenstock, an expert in the field of occupational medicine, testified that the lack of reported cases of neurologic disease among aluminum plant workers does not mean that they do not exist. She noted that there are many examples in occupational medicine where an association between a patient's work conditions and disease has gone unnoticed for years, often because the patient's illness has been misdiagnosed. If this court were to accept Intalco's argument, the first victims of any newly recognized occupational disease would always go uncompensated. The claimants should not be denied benefits simply because Drs. Longstreth and Rosenstock were the first physicians to systematically study the effects of pot room toxic exposures on the central nervous system of humans.

In *Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529 (D.C. Cir.), *cert. denied*, 469 U.S. 1062 (1984), Chevron argued that the expert medical opinion testimony was insufficient to support the jury's verdict in favor of the plaintiff on the ground that the expert's theory of causation was too novel to be admissible. Ferebee was an agricultural worker who allegedly contracted pulmonary fibrosis as a result of long-term exposure to the herbicide Paraquat. The plaintiffs sued Chevron, the sole distributor of Paraquat in the United

States, on the theory that it had failed to adequately warn against the possibility that chronic skin exposure could lead to lung disease and death, and that this failure proximately caused Ferebee's illness and death. *Ferebee*, 736 F.2d at 1531-32.

Ferebee's treating physicians concluded that his pulmonary fibrosis was caused by Paraquat poisoning. They based their opinions on their observation of him, medical tests, and on medical studies which they believed suggested that dermal absorption of Paraquat can lead to chronic lung abnormalities of the type from which Ferebee suffered. Chevron's medical experts attacked plaintiff's theory, contending that there was no medical evidence to show that Paraquat could lead to chronic lung disease. *Ferebee*, 736 F.2d at 1535. In response to Chevron's argument that the novelty of the plaintiff's theory rendered the medical testimony inadmissible, the court first distinguished between novel scientific *techniques* or *methodologies*, and controversial, scientific opinion testimony based on well-founded methodologies. The court continued:

> Thus, a cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound, such as use of tissue samples, standard tests, and patient examination, products liability law does not preclude recovery until a "statistically significant" number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical. In a courtroom, the test for allowing a plaintiff to recover in a tort suit of this type is not scientific certainty but legal sufficiency; if reasonable jurors *could* conclude from the expert testimony that paraquat more likely than not caused Ferebee's injury, the fact that another jury might reach the opposite conclusion or that science would require more evidence before conclusively considering the causation question resolved is irrelevant. That Ferebee's case may have been the first of its exact type, or that his doctors may have been the first alert enough to recognize such a case, does not mean that the testimony of those doctors, who are concededly well qualified in their fields, should not have been admitted.

*Ferebee*, 736 F.2d at 1535-36.

█ We agree with the *Ferebee* court that the requirement that expert medical testimony be based on methods generally accepted in the scientific community pertains to the *methods* used by, not the conclusions of, the expert witness. *See also* ER 703; *Osburn v. Anchor Labs., Inc.,* 825 F.2d 908, 914-15 (5th Cir. 1987) (an expert physician's opinion on causation need not be generally accepted in the scientific community; it is the *methods* upon which the expert relies in forming his or her opinion that must be generally accepted), *cert. denied,* 485 U.S. 1009 (1988).

As in *Ferebee,* the techniques and methodologies used by the attending physicians in this case are not challenged. Nor could they be successfully attacked. Drs. Longstreth and Rosenstock did extensive neurologic testing on these patients over a 2-year period. In systematically ruling out all other non-work-related possible causes for the patients' conditions, the physicians used only methods and techniques that are generally accepted in the scientific community. Further, their ultimate conclusion was completely consistent with the toxin-induced model of neurologic disease. In addition, Intalco had the opportunity to, and did, present its own expert medical testimony to challenge the theories on which the attending physicians based their conclusion. That a physician presented a controversial theory possibly linking aluminum exposure to the workers' disabilities did not render the testimony inadmissible. As in *Ferebee,* this was "a classic battle of the experts, a battle in which the jury must decide the victor." *Ferebee,* 736 F.2d at 1535.[9]

---

[9]We also reject Intalco's argument that the trial court should have instructed the jury that, as a matter of law, aluminum could not have caused the claimants' medical conditions. This is simply another way of arguing that the evidence was insufficient to support the jury's verdict. The issue of proximate cause was an issue of fact for the jury to decide. *Manson v. Foutch-Miller,* 38 Wn. App. 898, 691 P.2d 236 (1984). Const. art. 4, § 16 provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." Had the trial court given Intalco's proposed instruction, it would have invaded the jury's province and constituted an improper comment on the evidence. *See Egede-Nissen v. Crystal Mt., Inc.,* 93 Wn.2d 127, 139, 606 P.2d 1214 (1980); *State v. Jacobsen,* 78 Wn.2d 491, 495, 477 P.2d 1 (1970).

B. Challenge to Jury Instructions.

Intalco contends that the trial court erred in refusing to give the following jury instruction:

> You are instructed that the opinion of an expert is not entitled to any weight unless it is or reflects a scientific point of view generally accepted within the community of experts to which the witness belongs.

■■ The trial court properly refused to give this instruction, which directed the jury to evaluate the foundation for the medical experts' testimony and rule on its admissibility. It is the function of the court, not the jury, to rule on the admissibility of evidence. Admissibility of expert opinions is left to the sound discretion of the trial court. *State v. Ortiz*, 119 Wn.2d 294, 310, 831 P.2d 1060 (1992); *Fraser v. Beutel*, 56 Wn. App. 725, 734, 785 P.2d 470, *review denied*, 114 Wn.2d 1025 (1990). Further, Intalco did not object below to the foundation for the medical experts' opinion testimony. Only objections to evidence on the specific grounds made before the Board can be considered on appeal. *Sepich v. Department of Labor & Indus.*, 75 Wn.2d 312, 316, 450 P.2d 940 (1969). The trial court properly refused to allow Intalco to object to the admissibility of the claimants' expert witness testimony by means of a jury instruction.

Intalco also challenges the following instruction:

> You are to be concerned only with the effects of exposure in the pot room on these particular workers. If you determine that their medical conditions are occupational diseases, it does not matter if it was allegedly safe exposure for an average worker.

■ Intalco argues that this instruction was prejudicial and misleading because it suggested that the jury need not find that a specific condition in the workplace caused the claimants' disease. In determining whether an instruction could have confused or misled the jury, the court examines the instructions in their entirety. *Hamilton v. Department of Labor & Indus.*, 111 Wn.2d 569, 573, 761 P.2d 618 (1988). Here, the court's instructions clearly apprised the jury that it must find that conditions in the claimants' workplace proximately caused their medical conditions.

Further, in an effort to discredit the opinions of claimants' physicians, Intalco presented testimony from an expert that the NIOSH "threshold limit values" for airborne pollutants at the Intalco plant were arrived at by determining the maximum exposure that an average worker can endure without contracting an occupational disease. Based on this testimony, the jury could have concluded that the claimants' disease was not occupationally related because the plant was "safe" for the average worker.

█ In addition, the claimants' attending physicians testified that their individual susceptibilities may have been responsible for their varying degrees of impairment and the differences in the way their disease manifested itself. In light of this testimony, the trial court properly instructed the jury that the standard for determining causation is the individual claimant, not the "average worker". *See Groff v. Department of Labor & Indus.*, 65 Wn.2d 35, 43-44, 395 P.2d 633 (1964).

C. Admissibility of Co-Workers' Testimony.

In its last assignment of error, Intalco contends that the claimants should not have been permitted to present the testimony of their co-workers, Richard Hall and Walter Buechler, who testified that they had experienced and observed in other workers at Intalco symptoms similar to those displayed by the claimants. Intalco argues that this evidence was irrelevant under ER 401,[10] and that, even if marginally relevant, the prejudicial effect of the testimony outweighs its probative value under ER 403.[11]

---

[10]ER 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[11]ER 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

■ However, the claimants offered this testimony in direct rebuttal to the testimony of Intalco's expert witness, Dr. James Hughes. Dr. Hughes testified that, as medical director for Kaiser Aluminum, he had never observed the neurologic symptoms exhibited by the claimants among the 3,000 pot room workers in his company. This testimony invited the jury to conclude that, because Dr. Hughes, in all his years of experience with aluminum workers, had never seen neurologic problems in his patients, the claimants' disease must not be work related. Thus, the co-workers' testimony was directly relevant to rebut the inferences raised by Dr. Hughes' testimony.

Further, the trial court gave the following limiting instruction:

> You are instructed that the testimony of Mr. Hall and Mr. Buechler is not offered to prove that they have the same or a similar medical condition as any of the defendants. You are to consider their testimony only on the question of whether there are other persons working in the aluminum industry who have symptoms similar to those described by the defendants.

Any potential prejudice engendered by the testimony was cured by this limiting instruction. *See State v. Barber*, 38 Wn. App. 758, 771, 689 P.2d 1099 (1984), *review denied*, 103 Wn.2d 1013 (1985).

The judgment is affirmed.

PEKELIS and KENNEDY, JJ., concur.

Reconsideration denied September 28, 1992.

Review denied at 120 Wn.2d 1031 (1993).