[No. 67722-5-I.   Division One.   December 10, 2012.]

JANE POTTER, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent*.

302

James Colvin Causey Jr. (of Causey Law Firm), for appellant.

Robert M. McKenna, Attorney General, and Beverly N. Goetz, Senior Counsel, for respondent.

¶1 BECKER, J. — Jane Potter appeals a superior court decision denying her claim for workers' compensation for multiple chemical sensitivity disorder. Potter claims she

developed the disorder at her former law firm when she was exposed to chemicals off-gassed in a newly remodeled and defectively ventilated office. Because Potter failed to prove that her disorder arose "naturally" and "proximately" out of her employment so as to constitute an occupational disease, we affirm the denial of benefits.

## FACTS

¶2 Potter, a patent attorney and trained biochemist, worked for Davis Wright Tremaine LLP from August 2002 to December 2008. In June 2007, the firm relocated to newly remodeled offices in the Washington Mutual Tower. In the first weeks of working in her new office, Potter noticed a strong chemical odor and a metallic taste in her mouth. Her legal assistant likewise noticed a strong odor in the firm's new offices, particularly in Potter's office. As weeks went by, Potter noticed she had a recurring bloody nose and intensifying feelings of disorientation and fatigue. Potter first tried running a freestanding air filter in her office and then arranged to work entirely from home starting in September 2007. She met her assistant two or three times a week in the lobby of the office building to review files and sign documents.

¶3 On September 5, 2007, Potter saw her primary care physician, Dr. Christopher Shuhart. Dr. Shuhart's examination of Potter was normal, but his office nonetheless sought the Material Safety Data Sheets associated with the remodel of the new offices. These sheets inform manufacturers, distributors, or employers about chemicals used, their possible hazards, and protective measures. WAC 296-839-500. The chemicals associated with the Davis Wright remodel are numerous. Potter submitted a seven-page summary of the Material Safety Data Sheets to the Board of Industrial Insurance Appeals as exhibit 1; the full copy of the sheets was admitted as exhibit 2.

¶4 Between October 2007 and January 2008, on Dr. Shuhart's referral, Potter saw Dr. Matthew Keifer four

times at the Occupational Medicine Clinic at Harborview Medical Center. Potter had seen Dr. Keifer before when she experienced a reaction in 2004 to the toner in the copy machine at work, a reaction that resolved when the machine was moved. Dr. Keifer reviewed Potter's medical records and took an environmental history, but he found no source for Potter's symptoms. His physical examination of Potter was normal. Her oxygen saturation levels were normal, and so were her cardiac and pulmonary tests. Dr. Keifer's initial suspicion was that Potter's symptoms correlated with "an anxiety-induced state of concern triggered by the physical symptoms associated with exposure and the concern about the chemical hazard that that presents." He testified that his anxiety theory was a diagnostic construct he developed when assessing patients who have not been exposed to chemicals in quantities sufficient to produce neurological deficits. Dr. Keifer wrote a letter to Potter's firm, indicating his concern that the materials used in the remodel might be causing some of her symptoms and recommending that she not return to the office until they could identify the problem.

¶5 In January 2008, Potter felt much better and was cleared to return to the office. While her tests showed no abnormalities, Dr. Keifer warned that Potter's symptoms could recur if she returned to the office and nothing had changed. According to Potter, when she returned to the office, she felt ill within minutes, felt confused, and noticed the chemical odor was still present. She left the office and decided to continue working from home. At this point, Potter noticed that when she went to stores or places she used to frequent, she now experienced breathing problems, fatigue, and confusion.

¶6 On January 24, 2008, at Dr. Keifer's recommendation, an industrial hygienist evaluated Potter's office. The hygienist, Nancy Beaudet, identified two potential issues in Potter's office: a design flaw in the ducting and an odor coming from the window blinds. Beaudet discovered the

architectural plans erroneously called for two supply vents, where there should have been both a supply and a return vent. Beaudet testified that because of this ventilation flaw, the only path for air to leave the room was through the narrow opening between the door and the carpet, causing the pressure in Potter's office to be slightly elevated. But when she tested the air in the office, she found the carbon dioxide level was not elevated and the carbon monoxide level was unremarkable.

¶7 Beaudet noticed an odor when she unrolled the blinds and was surprised they would still be emitting an odor seven months after being installed. But she did not measure the level of any material the blinds might be off-gassing or determine whether other furnishings were off-gassing. Beaudet recommended removing the blinds from Potter's office and correcting the ventilation flaw. Lisa Wabik, the law firm's facilities manager, testified that she had an additional grill installed to allow more air flow to come through, even though a building engineer who inspected Potter's office after Beaudet's assessment noted there was a return vent "that was working just fine."

¶8 In February 2008, Dr. Keifer submitted a workers' compensation claim to the Department of Labor and Industries on Potter's behalf with the diagnosis "upper respiratory tract irritation," which he related to her workplace on a more probable than not basis. On the part of the form asking for the objective findings supporting Dr. Keifer's diagnosis, he answered, "NONE." On the part of the application Potter had filled out and signed in November 2007, she wrote she suffered injuries to her lungs, eyes, and energy level from exposure to fumes from the office remodel. Later that month, Dr. Keifer received Beaudet's report regarding the ventilation flaw in Potter's office. He then wrote to the firm's human resources manager, indicating Potter should continue to work from home, where she could better control her environment.

¶9 In September 2008, Dr. Keifer diagnosed Potter with multiple chemical sensitivity disorder. Dr. Keifer defined

the disorder, using criteria developed by Dr. Mark Cullen, an occupational and environmental medicine expert formerly at Yale University, as a condition starting with an overexposure event that causes illness and then recurrent episodes of nonspecific symptoms involving more than one organ system. Dr. Keifer also referred to the National Institutes of Health's definition of the syndrome: a chronic condition with reproducible symptoms in response to low levels of exposure to multiple unrelated chemicals that improves or resolves when the incitants are removed. Dr. Keifer, who since 1987 has seen patients with these symptoms, testified that there are no objective tests for diagnosing the disorder and that Potter's diagnosis was based on credible symptomatic reporting. He referred Potter to a naturopath, as he had no pharmacological solution to her symptoms.

¶10 On May 7, 2009, the Department denied Potter's claim, after first sending Potter to be examined by two other physicians. Among other reasons, the Department rejected the claim because Potter's condition was "not the result of exposure alleged" and was "not an occupational disease as contemplated by section 51.08.140 RCW." Potter took an appeal to the Board of Industrial Insurance Appeals.

¶11 On June 18, 2010, the industrial appeals judge issued a proposed decision in favor of Potter. The Department had moved in limine to exclude all evidence of multiple chemical sensitivity disorder under *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923), arguing the claimed disorder is a social or cultural phenomenon rather than a medical diagnosis generally accepted in the scientific community. The judge rejected the *Frye* argument, admitted testimony regarding the disorder, and found that in Potter's case, her condition was "naturally and proximately caused by the distinctive condition of exposure to chemicals in her workplace as a result of the remodel" and "constitutes an occupational disease." The Department petitioned for review.

¶12 On October 4, 2010, the Board issued a final decision rejecting Potter's claim for workers' compensation benefits. The Board declined to decide whether multiple chemical sensitivity disorder could ever be an occupational disease, and concluded only that the condition had not been established as an occupational disease as diagnosed in Potter's case:

> We are free to reject MCS as an occupational disease within the meaning of RCW 51.08.140 or even as a disease entity. However, because we do not believe that Multiple Chemical Sensitivity, *as it is diagnosed in the facts of this case*, meets the definition of an occupational disease, we need not reach the issue of whether we accept this condition as an occupational disease.
>
> . . . .
>
> . . . In this case, we have evidence of use of certain chemicals in the remodel, some of which can cause neurological symptoms in certain quantities, but no evidence of exposure to anything other than permissible limits. Additionally, there is evidence that the claimant felt disoriented and confused, but there is no neuropsychological or other testing that quantifies or otherwise specifies the nature of her difficulties.

(Emphasis added.) Potter appealed the Board's decision to King County Superior Court.

¶13 Before trial, the Department renewed its *Frye* motion, objecting to testimony in the record regarding Potter's claimed disorder. The court rejected the motion, finding that the condition was a recognized disorder even though its specific etiology "remains in dispute":

> Scientific literature has established the syndrome and has measured reactions to chemical stimuli in patients diagnosed with [multiple chemical sensitivity].
>
> . . . Those committed to a physical origin for the disorder conclude most of their studies with recommendations for further study or questions left unanswered. Whether the disorder is psychogenic or physical in its etiology, however, it is a recognized disorder.

¶14  The court directed the parties to schedule a hearing on the merits or to waive oral argument. The procedure chosen is not documented in the record, but since no jury was involved, it appears the parties agreed to a bench trial. On September 1, 2011, the court entered findings of fact and conclusions of law as proposed by the Department, affirming the Board's decision and finding that Potter did not sustain an occupational disease within the meaning of RCW 51.08.140. Potter appeals.

## STANDARD OF REVIEW

¶15  Potter urges de novo review of the superior court's decision, in part because she contends the court's decision was an order granting judgment to the Department as a matter of law under CR 50. While it is true that the Department submitted a brief that was styled as a motion for judgment as a matter of law, it was also styled alternatively as a trial brief. By entering findings, the court appears to have ignored the CR 50 aspect of the motion. We see no basis in the record for accepting Potter's interpretation of the court's ruling as having been entered under CR 50 or CR 56.

¶16  Potter further contends de novo review is warranted because the case involves a question of statutory interpretation about whether RCW 51.08.142 and WAC 296-14-300 preclude a claim for multiple chemical sensitivity as a mental condition caused by stress. She maintains that her condition is physiological, not mental. But the decision under review did not conclude that Potter was suffering from a mental condition caused by stress. The court simply confirmed the Board's statement that proof of an occupational disease cannot be based on the claimant's subjective perception of exposure to harmful substances. And the court, like the Board, deliberately sidestepped the scientific debate about whether the disorder is physical or psychogenic in origin. The court declined to make a ruling cat-

egorically accepting or rejecting the disorder as a compensable occupational disease. Instead, the court focused on whether Potter's disorder was compensable as an occupational disease *under the facts of her case.* On appeal to this court, the Department has abandoned its objections under *Frye* to the admissibility of evidence about multiple chemical sensitivity as a disease. So there is no question of law that necessitates de novo review.

¶17 Rather, the Industrial Insurance Act, Title 51 RCW, governs the standard of review in workers' compensation cases, where an evidentiary hearing occurs only at the Board. RCW 51.52.100, .115. Potter had the burden of establishing a prima facie case for relief before the Board. RCW 51.52.050(2)(a). The superior court reviews the Board's decision de novo, based solely on the board record. RCW 51.52.115. In the superior court, Potter had the burden of proving the Board's findings and decision were not prima facie correct. This court reviews the board record " 'to see whether substantial evidence supports the findings made after the superior court's de novo review, and whether the conclusions of law flow from the findings.' " *Ruse v. Dep't of Labor & Indus.,* 138 Wn.2d 1, 5, 977 P.2d 570 (1999), quoting *Young v. Dep't of Labor & Indus.,* 81 Wn. App. 123, 128, 913 P.2d 402 (1996). Evidence is substantial if "sufficient to persuade a fair-minded, rational person of the truth of the matter." *R&G Probst v. Dep't of Labor & Indus.,* 121 Wn. App. 288, 293, 88 P.3d 413, *review denied,* 152 Wn.2d 1034 (2004).

¶18 Findings of fact 1.10 and 1.12 are the heart of the case:

1.10 There is no evidence, but only Ms. Potter's subjective perception, that she was exposed to chemical fumes or off-gassing from new furniture or interior remodeling at levels sufficient to cause physical harm during the course of her employment with Davis Wright Tremaine LLP.

. . . .

1.12 An exposure to interior remodeling or new furniture is not a distinctive condition of employment in a law office. Exposures to interior remodeling and new furniture are common occurrences in everyday life.

¶19 Even though we reject Potter's argument that the standard of review is de novo, finding of fact 1.10 necessitates a particularly thorough review because we must agree there is "no evidence" that Potter was exposed to chemical fumes or off-gassing at levels sufficient to cause physical harm.

## ARISING PROXIMATELY

¶20 The first issue is whether substantial evidence supports the court's finding that Potter's disorder did not arise proximately out of her employment.

¶21 To establish an occupational disease, Potter had to show her disorder arose both (1) "naturally" and (2) "proximately" out of her employment. *Dennis v. Dep't of Labor & Indus.*, 109 Wn.2d 467, 481, 745 P.2d 1295 (1987). To meet the "proximately" prong, Potter had to establish "by competent medical testimony" that her claimed condition was "probably, as opposed to possibly, caused by the employment." *Dennis*, 109 Wn.2d at 477. The causal link must be removed "from the field of speculation and surmise." *Zipp v. Seattle Sch. Dist. No. 1*, 36 Wn. App. 598, 601, 676 P.2d 538, *review denied*, 101 Wn.2d 1023 (1984). Indeed, if there is no evidence of causation beyond a possibility, it is error to submit the case to the jury. *Zipp*, 36 Wn. App. at 601.

¶22 Here, all Potter has established is the *possibility* that she was exposed to chemicals in her newly remodeled office that made her sick. She points to the Material Safety Data Sheets as circumstantial evidence that particular chemicals were present in her office. At oral argument here, counsel for Potter cited *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 260 P.3d 857 (2011), where the court found admissible a physician's opinion on causation that

was based in part on Material Safety Data Sheets. *See Anderson*, 172 Wn.2d at 604, 611-12 (holding *Frye* test was not implicated by proposed testimony of employee's expert that cause of birth defect of her son was exposure to toxic solvents). But Dr. Keifer, Potter's treating physician and an expert in the field of occupational medicine, testified only that some of the chemicals listed in the Material Safety Data Sheets "would *potentially* cause illness if people were exposed to them *in any substantial concentration*." (Emphasis added.) The only chemical Dr. Keifer discussed, in general and at the urging of Potter's counsel, was formaldehyde, which he said was a common material in pressed wood and a carcinogen and allergen, and "in high enough concentrations, it could be an anesthetic." Dr. Keifer did not testify that exposure to formaldehyde caused Potter's symptoms.

¶23 We give special consideration to Dr. Keifer's testimony as Potter's treating physician. *Lewis v. Simpson Timber Co.*, 145 Wn. App. 302, 323, 189 P.3d 178 (2008). Nonetheless, the testimony of medical experts "must have established that it was more probable than not that her exposure to chemicals" in the office caused Potter's occupational disease. *Lewis*, 145 Wn. App. at 323. Dr. Keifer's testimony is too thin to meet this test. He said all of Potter's tests came back grossly normal, with the possible but minor exception of a high pulse reading and a one-time unexplained drop in blood oxygen saturation from 97 to 93. Although Dr. Keifer recommended Potter undergo neuropsychological testing, this had not occurred by the time of the board hearing.

¶24 Beaudet, the industrial hygienist, conducted her evaluation of Potter's office in late January 2008, long after Potter's alleged exposure in mid-June to September 2007. Her testing of the air in Potter's office showed the levels of carbon monoxide and carbon dioxide were largely unremarkable. Beaudet testified that normal carbon dioxide concentration is significant "as an indicator of the effective-

ness of the ventilation." Theoretically, if Potter's office had two supply vents, instead of a supply and a return vent, the air quality in the office could have been compromised. But Beaudet found only that the air pressure in Potter's office was slightly elevated and that the window blinds gave off an odor. She did not actually test for off-gassing chemicals in Potter's office. Beaudet's testimony about how organic compounds continue to off-gas from new furnishings after they are installed was too general to support Potter's claims that off-gassing chemicals in her office caused her symptoms.

■■ ¶25 Potter claims her proof was analogous to the evidence found sufficient to support benefits for the aluminum plant workers in *Intalco Aluminum Corp. v. Department of Labor & Industries*, 66 Wn. App. 644, 833 P.2d 390 (1992), *review denied*, 120 Wn.2d 1031 (1993). Under *Intalco*, she argues, it was unnecessary for her to identify a specific chemical that made her sick. As the Board noted, this represents "an overly simplistic view of *Intalco*." In *Intalco*, this court upheld a jury's finding that three workers, who worked in the same aluminum reduction pot room for more than a decade, developed a neurological illness that was a compensable occupational disease. The pot room lacked primary emission controls, or "hoods," covering the pots. It was so "dusty and gassy" at times that the workers could not see 100 to 200 feet ahead, and they emerged covered with carbon and ore dust at the end of their work day. *Intalco*, 66 Wn. App. at 648-49. An industrial hygienist identified *several* toxins in the pot room, some of which had been associated with neurologic disease, and found fluoride toxin above the threshold limits. *Intalco*, 66 Wn. App. at 649, 655. Thus, it was not fatal to the workers' case that their medical witnesses were unable to identify the *specific* toxin that caused their neurological disease. *Intalco*, 66 Wn. App. at 655-58. What a worker must do is prove "that conditions in the workplace *more probably than not* caused his or her disease or disability." *Intalco*, 66 Wn. App. at 658

(emphasis added). The Intalco workers met this burden of proof. Potter did not.

¶26 Potter's case is less like *Intalco* and more like a case cited by the Department, *Kuxhausen v. Tillman Partners, LP*, 291 Kan. 314, 241 P.3d 75 (2010). *Kuxhausen* is a personal injury case where a worker claimed her exposure to paint at an accounting firm caused her to develop multiple chemical sensitivity disorder. The Kansas Supreme Court upheld the dismissal of her claim for lack of causation. *Kuxhausen*, 241 P.3d at 81. The court noted that the worker's medical exams "revealed no abnormalities" and there was no "data concerning the level or amount of chemicals to which [she] was exposed or the mechanism of exposure." *Kuxhausen*, 241 P.3d at 81. Like Dr. Keifer, Kuxhausen's doctor testified only that there were substances listed on the Material Safety Data Sheets "that can make people sick," with no supporting basis for concluding that those materials did make the claimant sick. *Kuxhausen*, 241 P.3d at 81. The court held that the doctor's opinion was based on the logical fallacy that because the symptoms followed the exposure, they must be caused by it. "Such reasoning is nothing more than speculation." *Kuxhausen*, 241 P.3d at 81; *see also Elshaug v. Workforce Safety & Ins.*, 2003 ND 177, 671 N.W.2d 784 (holding sufficient evidence supported the department's conclusion that the worker failed to prove her sensitivity to chemicals was fairly traceable to her employment).

¶27 According to Potter, such criticisms fundamentally misunderstand the nature of her disorder, which presents itself in response to low levels of exposure to unrelated chemicals, causing the sufferer to become disoriented and fatigued, as well as further sensitized. The Board recognized the difficulty for a claimant in this situation but responded that "when the levels of chemicals are so low as to be virtually undetectable, and the ensuing medical conditions are as vague as fatigue and disorientation, we do not think that Ms. Potter's condition meets the definition of an occupational disease." We agree.

¶28 Even the criteria followed by Dr. Keifer for diagnosing the disorder require, first, "an overexposure event." The reporting of symptoms, no matter how credible, does not in itself demonstrate an exposure, nor does it provide a nexus between the symptoms and the workplace. Indeed, before moving into the office, Potter exhibited some of the same symptoms, reporting reactions to photocopiers and to stressful events in her life. Beyond Beaudet's very general testimony that new furnishings are often a source of off-gassing chemicals, there is no proof here of chemical exposure at *any* level. The superior court's determination that Potter's disorder did not arise proximately out of her employment is supported by the record.

## ARISING NATURALLY

¶29 The second issue is whether substantial evidence supports the finding that Potter's disorder did not arise naturally out of her employment.

¶30 Under *Dennis,* the "arising naturally" prong of the occupational disease test requires Potter to prove her condition came about "as a matter of course as a natural consequence or incident of distinctive conditions" of her particular employment. *Dennis,* 109 Wn.2d at 476, 481. The focus is on the conditions giving rise to the occupational disease, not on whether the disease itself is common to that particular employment. *Dennis,* 109 Wn.2d at 481. As *Dennis* explains, Potter must show her "particular work conditions" more probably caused her disability than conditions in everyday life or all employments in general. *Dennis,* 109 Wn.2d at 481. Potter's "particular work conditions" must be conditions of her particular occupation as opposed to conditions coincidentally occurring in her workplace. *Dennis,* 109 Wn.2d at 481.

¶31 As distinctive conditions of her employment, Potter points to the defective ventilation in her office, combined with the odor emanating from the new blinds, which she

attributes to off-gassing chemicals. But as the Board noted, "Remodels are everywhere, and by no means limited to law offices, or to work for that matter." For example, the court has held that a slaughterhouse plant worker who contracted spinal meningitis after his co-worker coughed in his face did not satisfy the "naturally" element because his exposure was "merely coincidental and not a result of any distinctive condition of his employment." *Witherspoon v. Dep't of Labor & Indus.*, 72 Wn. App. 847, 851, 866 P.2d 78 (1994). There was testimony in *Witherspoon* that meningitis " 'occurs almost everyplace commonly' " and requires hours of exposure to transfer the bacteria from one person to another. *Witherspoon*, 72 Wn. App. at 849-50.

¶32 In contrast, the sheet metal worker in *Dennis* provided sufficient evidence that his osteoarthritis arose "naturally" out of his employment, where he repetitively used tin snips four to five hours a day over 38 years. *Dennis*, 109 Wn.2d at 483. In *Sacred Heart Medical Center v. Department of Labor & Industries*, 92 Wn.2d 631, 637, 600 P.2d 1015 (1979), an intensive care unit nurse provided sufficient evidence that her hepatitis arose "naturally" out of her employment, where there was uncontradicted evidence showing her other activities could not have exposed her to the disease. Unlike the workers in *Dennis* and *Sacred Heart*, Potter provided no evidence that her office exposed her to a greater risk of contracting multiple chemical sensitivity than other environments she had encountered. The record supports the superior court's determination that Potter's disorder did not arise naturally out of her employment.

¶33 In summary, the Board's decision rests squarely on the fact that there is no objective evidence in the record that Potter was exposed at her office to chemicals at levels that caused her to develop multiple chemical sensitivity. This rationale supports the denial of benefits under RCW 51.08-

.140, which defines an "occupational disease" as one that "arises naturally and proximately out of employment."[1]

¶34 Because Potter's claim for workers' compensation benefits fails, we deny her claim for attorney fees.

¶35 Affirmed.

Cox and Lau, JJ., concur.

Reconsideration denied January 15, 2013.

Review denied at 177 Wn.2d 1017 (2013).

---

[1] We do not address the Department's further argument that Potter's condition is a mental condition caused by stress and therefore excluded from compensation under RCW 51.08.142 and WAC 296-14-300. These provisions were cited only in conclusion of law 2.3: "Per RCW 51.08.142 and WAC 296-14-300, to the extent that subjective perceptions of employment conditions or the employment environment, or a fear of exposure to chemicals, are mental, not physical, conditions, they do not fall within the meaning of RCW 51.08.140." This language does not state a finding or conclusion that Potter's symptoms amounted only to a mental condition caused by stress.